Irving MILLER, Plaintiff-Appellant,

v.

GENERAL OUTDOOR ADVERTISING CO., Inc., Gamble-Skogmo, Inc. and Alleghany Corporation, Defendants-Appellees.

Securities and Exchange Commission, Amicus Curiae.

No. 18, Docket 28781.

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1964.

Decided Oct. 27, 1964.

Stanley L. Kaufman, of Kaufman, Taylor & Kimmel, New York City (Shepard S. Miller, New York City, on the brief), for plaintiff-appellant.

James W. Deer, of Holtzmann, Wise & Shepard, New York City (MacDonald Smith, Irving S. K. Chin, New York City, on the brief), for defendants-appellees.

George P. Michaely, Jr., Sp. Counsel, S. E. C., Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, on the brief), for amicus curiae.

Lewis Carroll, Washington, D. C., for Alleghany Corp.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge:

Irving Miller, a stockholder in Alleghany Corporation, sued derivatively in behalf of the Corporation to recover alleged "short-swing" profits realized by Gamble-Skogmo, Inc., and its majority-owned subsidiary, General Outdoor Advertising Co., from what he claimed to be a purchase and sale of Alleghany stock during a six-month period. Miller based his suit on the provisions of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). He appeals from the judgments entered upon orders granting summary judgment to Gamble and General Outdoor. Because we believe that summary judgment under Rule 56 of the Federal Rules of Civil Procedure was prematurely or unwisely employed to resolve the exceedingly complex dispute presented to the District Court, we reverse and remand for further proceedings consistent with this opinion.

Section 16(b)'s profit-retrieving remedy was invoked by Miller on the basis of the following essential facts, which are complex. On October 4, 1962, Gamble agreed to buy from the Murchison Brothers partnership 750,000 shares of Alleghany common stock at $10 per share and at the same time agreed that General Outdoor, its majority-owned subsidiary, would purchase the identical number of Alleghany shares at the same price through General Outdoor Realty Corp., its wholly-owned subsidiary. The purchases were consummated the following day, October 5, 1962, and the shares, representing about 15.3% of the approximately 9,800,000 outstanding shares of Alleghany common stock, were delivered against payment of $15,000,000. Gamble thus became the beneficial owner of more than 10% of Alleghany stock and, as a result, made itself liable for "any profit realized" from any of the transactions specified in Section 16(b).

The complicated transactions reveal further that the October 4, 1962, sale of 1,500,000 shares was coupled with an "Agreement of Put and Call" between Murchison Brothers and Gamble. Under the terms of the agreement Gamble obtained a "call" or option, exercisable between October 5, 1962, and May 31, 1963, to purchase from Murchison Brothers a minimum of 1,500,000 and a maximum of 2,000,000 shares of Alleghany common stock at $10 per share. Simultaneously, the Murchison Brothers obtained a "put," exercisable between June 1 and June 30, 1963, to sell to Gamble between 1,500,000 and 2,000,000 shares of Alleghany common stock at $10 per share. The put and call agreement thus involved 15.3% to 20.4% of the outstanding Alleghany common shares in addition to the 15.3% purchased outright the same day.

An "Amendatory and Supplemental Agreement" of May 29, 1963, made Gamble's "call" exercisable until June 30, 1963, and Murchison Brothers' "put" exercisable until July 31, 1963. Although the October 4 agreement made the "put" exercisable only after the expiration of the "call," under the amended agreement both could be exercised within the same thirty-day period, June 1 to June 30, 1963. Thereafter, by letter dated June 28, 1963, Gamble's "call" was extended to July 31, 1963, the same date Murchison Brothers' "put" was scheduled to expire.

These complex bilateral arrangements between Gamble and Murchison Brothers became even more involved when they took multilateral form. On July 1, 1963, Gamble contracted to sell 1,000,000 shares of Alleghany common stock to Allan F. Kirby, 100,000 shares to Coral Ridge Properties, and 500,00 shares to Allied Properties, all at $10.50 per share. Each contract included a stipulation that neither the buyer nor the seller would be required to consummate the purchase and sale until the transactions were approved by the shareholders of the five mutual funds having investment advisory contracts with Investors Diversified Services, Inc., an Alleghany subsidiary. We presume the stipulations were designed to meet the requirements of Section 15 of the Investment Company Act of 1940, 15 U.S.C. § 80a–15.

Then, perhaps in an effort to reflect Gamble's new obligations, the put and call agreement between it and the Murchison Brothers was once again extended on July 29, 1963. This time the expiration date of Gamble's "call" was moved forward to October 15, 1963, and Murchison Brothers' "put" was extended to October 25, 1963. The extension agreement also provided that if before October 1, 1963, the five mutual funds bound by contract to Investors Diversified Services had given notice of meetings of their shareholders to reapprove "the re-execution of such investment advisory contracts," (a) Gamble's "call" would be extended to ten days after the conclusion of such shareholder meetings but not later than November 15, 1963, and (b) Murchison Brothers' "put" would be extended to twenty days after the conclusion of such shareholder meetings but not later than November 25, 1963. These progressive developments suggest that the put and call agreement, which originated as part of a complex of transactions for trans-

ferring the control of Alleghany from the Murchison Brothers to Gamble, eventually became part of an even more intricate plan to re-transfer the control of Alleghany to Allan F. Kirby and two co-purchasers.

In the midst of these entangled transactions we observe that Miller rushed into his derivative action under Section 16(b) on July 5, 1963, after Gamble had *contracted to sell* the 1,600,000 shares of Alleghany but *before* the final July 29 extension of the put and call agreement and without a request to Alleghany that it take action against Gamble pursuant to Section 16(b). Where relevant to our consideration, that section provides that "the owner of any security of the issuer" may sue "in the name and in behalf of the issuer" to recover "any profit realized" by an insider, as defined in Section 16(a), "from any purchase and sale, or any sale and purchase, of any equity security of such issuer * * * within any period of less than six months," "if the issuer shall fail or refuse to bring such suit within sixty days after request * * *." Miller's complaint alleged that "in or about July 1963" Gamble bought "approximately 1,900,000" Alleghany shares and that "on or about July 3, 1963" Gamble sold "approximately 1,600,000" Alleghany shares. The theory, as we read it, was that the transactions between Murchison Brothers and Gamble on May 29, June 28, and July 29, 1963, when matched with the transactions between Gamble and Kirby, Coral Ridge, and Allied on July 1, 1963, amounted to a "purchase and sale" of an "equity security" of Alleghany within a six-month period, any profits from which would be recoverable by Alleghany under Section 16(b).

Alleghany, brought into the suit as a nominal defendant, responded by moving for summary judgment on the ground that before bringing his suit Miller had failed, without justification, to fulfill Section 16(b)'s requirement that he first request Alleghany to institute suit and then afford it a sixty-day period to act on his request. Gamble and General Outdoor also moved for summary judgment, but on other grounds. They urged that as a matter of law Section 16(b) did not apply to the transactions in question, at least given the posture of these transactions at the time Miller brought suit. Judge Wyatt ruled on both motions on the same day. He denied Alleghany's motion on the ground that the affidavits established that an issue of fact existed as to whether a demand would have been futile and that this issue could not be resolved without a trial.[1] But, simultaneously, the District Court judge granted the motions of Gamble and General Outdoor. It was his view that the June 28, 1963, extension of Gamble's call was not a "purchase" of an Alleghany "equity security" within the meaning of Section 16(b).[2] Miller v. General Outdoor Advertising Co., 223 F.Supp. 790 (S.D.N.Y.1963).

Because we believe that on the complicated factual pattern presented here it would have been more prudent to permit all the facts to be fully developed at a trial before attempting to determine the applicability of Section 16(b) to Gamble's extremely involved transactions in Al-

---

1. We express no opinion on the propriety of this ruling.

2. Section 3(a) (11) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a) (11), provides: "The term 'equity security' means any stock or similar security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any other security which the Commission shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations as it may prescribe in the public interest or for the protection of investors, to treat as an equity security."

The District Court judge apparently rejected the S. E. C.'s theory that by acquiring a new call option Gamble entered into a "contract to purchase" an equity security of Alleghany. Section 3(a) (13), 15 U.S.C. § 78c(a) (13) defines "purchase" to include a "contract to purchase" and would therefore, in the S. E. C.'s view, bring the transaction under Section 16(b).

948

leghany's stock, we are compelled to reverse the orders granting summary judgment.

The difficult substantive question—whether the transactions sued upon come within the reach of Section 16(b)—should have been decided only after an opportunity to develop the facts fully at a trial and not by interpreting incomplete and ambiguous affidavits. In this connection, we note that the District Court granted summary judgment on the ground that even if there was a "purchase" on June 28, 1963,[3] of "something," that "something" was not an "equity security" of Alleghany within the meaning of Section 16(b). Judge Wyatt reached this conclusion, as we read his opinion, by determining that Gamble's "call" was not issued by Alleghany, was not negotiable, and was not susceptible of being traded in any securities market. He found it unnecessary, therefore, to deal with the broader question of Section 16(b)'s applicability to insiders' purchases of put and call options generally. But, despite the narrower basis for decision, we believe it would have been sounder to postpone deciding whether Gamble's acquisition of the "call" on June 29, 1963, represented a "purchase" of an "equity security" until after all the facts of the highly sophisticated transactions were fully developed. For, after such full exposition of the facts, the question whether Gamble "purchased" an "equity security" might be cast in a new light requiring a different answer and perhaps a direct determination of the applicability of Section 16(b) to insiders' purchases of put and call options.

In Blau v. Lamb, 163 F.Supp. 528 (S.D. N.Y.1958), Judge Bryan, faced with a similar dilemma, wrote that "in cases involving short-swing transactions which do not fall squarely within cases thus far decided, it is essential that all facets of the transactions be fully explored so that every factor which would bear on the basic questions presented can be considered." 163 F.Supp. at 534. See Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); cf. Empire Electronics Co. v. United States, 311 F.2d 175 (2d Cir. 1962); Subin v. Goldsmith, 224 F.2d 753, 758 (2d Cir. 1955). Since this is the first case to raise the difficult and far-reaching question whether the acquisition of a call may be a "purchase" of an "equity security" under Section 16(b), it falls within that twilight zone where full development of the facts is necessary to decide whether the transactions involved were susceptible to the type of speculation the section seeks to eliminate.

It seems clear, therefore, that it was improvident to cut through the tangled web of this complex litigation by deciding an isolated question on a summary judgment motion, thereby disposing of the entire case, when so much was riding on related issues.

■■ We do not, by our disposition of this case, weaken the force of our recent holdings that the summary judgment procedure should be used to pierce the allegations of pleadings and screen out sham issues of fact. See, e. g., Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964). Here we simply recognize that there are instances where summary judgment is too blunt a weapon with which to win the day, particularly where so many complicated issues of fact must be resolved in order to deal adequately with difficult questions of law which remain in the case.

We therefore reverse the judgments dismissing the complaint and remand to the District Court. At the appropriate time the District Court can consider whether leave should be given to the plaintiff to amend his complaint. We would also deem it appropriate for the District Court to consolidate this action with others pending that involve the same transactions.

---

3. For the difficulties inherent in deciding when a "purchase" occurs in such labyrinthine financial dealings, see Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964).