**BRISTOL–MYERS COMPANY, Plaintiff,**

v.

**ERBAMONT INC., Farmitalia Carlo Erba, S.r.l., and Erbamont, N.V., Defendants.**

**Civ. A. No. 89–103–CMW.**

United States District Court, D. Delaware.

Oct. 30, 1989.

David A. Anderson, of Potter, Anderson & Corroon, Wilmington, Del. (S. Leslie Misrock, John J. Lauter, Jr., Brian M. Poissant, Laura A. Coruzzi, and John J. Normile, of Pennie & Edmonds, New York City, of counsel), for plaintiff.

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, Del. (Garland P. Andrews, David L. Hitchcock, Eugenia S. Hansen, and Stuart L. Watt, of Richards, Harris, Medlock & Andrews, Dallas, Tex., of counsel), for defendant Erbamont Inc.

OPINION

CALEB M. WRIGHT, Senior District Judge.

The plaintiff, Bristol–Myers Company ("Bristol–Myers") brought a declaratory judgment action pursuant to 28 U.S.C. §§ 1338(a), 2201, and 2202 on March 3, 1989, against Defendants Erbamont, Inc. ("Erbamont"), Farmitalia Carlo Erba, S.r.l. ("Farmitalia"), and Erbamont, N.V. Bristol–Myers sought a declaration of invalidity, noninfringement, and unenforceability with respect to United States Patent 3,803,-124 (the "'124 patent").

On April 12, 1989, Erbamont counterclaimed against Bristol–Myers for infringement of the '124 patent. This counterclaim was grounded upon the recently enacted patent process statute, 35 U.S.C. § 271(g).[1] In response to this counterclaim, Bristol–Myers moved for summary judgment of

---

**1.** § 271(g) was added to the patent code (Title 35) by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100–418, 102 Stat. 1107, 1563–1564, § 9003.

noninfringement on May 5, 1989. Accordingly, before the Court is plaintiff Bristol–Myers' motion for summary judgment of noninfringement.[2]

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1338(a), 2201, and 2202.

For the reasons which will be stated herein, the Court grants Bristol–Myers' motion for summary judgment. As a result, Erbamont's counterclaim for infringement will be dismissed with prejudice.[3]

## I. FACTS

The '124 patent issued on April 9, 1974 to Societa Farmaceutici Italia, the predecessor of Farmitalia.[4] This patent discloses and claims, *inter alia*, a process for the preparation of doxorubicin, a well-known drug which is used in the chemotherapeutic treatment of cancer. Erbamont sells doxorubicin hydrochloride as a chemotherapeutic agent in the United States through its Adria Laboratories Division.

In December 1987, Bristol–Myers filed an Abbreviated New Drug Application ("ANDA") with the United States Food and Drug Administration ("FDA") seeking approval to import and sell doxorubicin hydrochloride for use in the chemotherapeutic treatment of cancer. Bristol–Myers' ANDA indicated that bulk doxorubicin hydrochloride would be manufactured in Japan by Meiji Seika Pharma International, Ltd. ("Meiji Seika") in accordance with a process approved by the FDA as part of Bristol–Myers' ANDA. The FDA approved Bristol–Myers' ANDA for doxorubicin hydrochloride on April 13, 1989.

During the FDA's review of its doxorubicin hydrochloride ANDA, Bristol–Myers received shipments of bulk doxorubicin hydrochloride from Meiji Seika totalling 13 kilograms.[5] Bristol–Myers received the 13 kilograms by two separate shipments from Meiji Seika. The first shipment consisted of 2 kilograms that arrived in September of 1988; the second shipment consisted of 11 kilograms that arrived in mid-February of 1989. Meiji Seika delivered both of these shipments of bulk doxorubicin hydrochloride to Bristol–Myers' finishing facilities located in Mayaguez, Puerto Rico, Foreign Trade Zone No. 7. Although the 13 kilograms of doxorubicin hydrochloride was physically present in Puerto Rico before February 23, 1989,[6] it apparently was warehoused in the custody of the United States Customs Service at that time. Bristol–Myers did not withdraw any of the 13 kilograms of doxorubicin hydrochloride from the warehouse and did not pay customs duties until after February 23, 1989.[7]

Bristol–Myers issued a purchase order for the 2 kilogram shipment on September 14, 1988 and Meiji Seika shipped this amount on September 16, 1988. The 2 kilogram shipment, which was identified by Lot Nos. CDXB–20009 and CDXB–20010, was received at the Mayaguez facility on September 29, 1988. Bristol–Myers issued a purchase order for the 11 kilogram shipment on February 2, 1989, and Meiji Seika shipped this amount on about February 11, 1989. The 11 kilogram shipment, which was identified by Lot Nos. CDXB–20011, CDXB–20012, CDXB–20013, CDXB–20016,

**2.** Defendants Farmitalia and Erbamont, N.V. filed motions to dismiss for lack of personal jurisdiction on May 15, 1989. By stipulation and order dated August 22, 1989, Farmitalia and Erbamont, N.V. were dismissed from the original action brought by Bristol–Myers.

**3.** The present decision does not affect the final disposition of plaintiff Bristol–Myers' original complaint and, therefore, it will not be necessary for the Court to address the validity and enforceability of the '124 patent at this stage.

**4.** Farmitalia and Erbamont are operating subsidiaries of Erbamont, N.V. Erbamont is the exclusive licensee of Farmitalia in the United States with respect to the '124 patent.

**5.** Meiji Seika had manufactured this bulk doxorubicin hydrochloride by a process that the FDA had previously approved. *See* Affidavit of Alan F. Herbert, Vice President and General Manager of the Oncology Division of Bristol–Myers ("Herbert Affidavit") at ¶ 6.

**6.** February 23, 1989 was the effective date of 35 U.S.C. § 271(g). *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100–418, 102 Stat. 1107, 1566–1567, § 9006.

**7.** *See* note 8 *infra*.

CDXB–20017, and CDXB–20018, was received at the Mayaguez facilities on February 16, 1989. The 13 kilograms of doxorubicin hydrochloride remained warehoused in the custody of the Customs Service, until May 1, 1989, at which time Bristol–Myers withdrew 1.257 kilograms of the doxorubicin hydrochloride for entry into United States commerce. This amount of the doxorubicin hydrochloride was taxed with custom duties by the United States Customs Service on this same day.[8] Bristol–Myers first received processed doses of the doxorubicin hydrochloride in the continental United States · at Evansville, Indiana on May 2, 1989.

All 13 kilograms of the doxorubicin hydrochloride had entered the Mayaguez facility prior to the FDA's approval of the Bristol–Myers ANDA. This bulk doxorubicin hydrochloride is currently being processed at the Mayaguez facility into individual vials of lyophilized injectable preparations of powdered doxorubicin hydrochloride. Bristol–Myers has indicated that sales of these vials containing individual lyophilized doses of doxorubicin hydrochloride will begin in the near future as permitted by the terms of Bristol–Myers' recently approved ANDA.

Erbamont's counterclaim for infringement under 35 U.S.C. § 271(g) is based upon Bristol–Myers' receipt of the 13 kilograms of doxorubicin hydrochloride at the Mayaguez, Puerto Rico facility. Erbamont contends that this claim is inappropriate for resolution by summary judgment because the terms "imports" and "importation" in section 271(g) require an examination of Bristol–Myers' intent in causing the 13 kilograms to be shipped to its facility in Puerto Rico. Bristol–Myers, however, asserts noninfringement as an affirmative defense and specifically argues that the 13 kilograms of doxorubicin hydrochloride had been "imported" into the United States prior to the effective date of 35 U.S.C. § 271(g).

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) ("Rule 56") provides that summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A court confronted with a summary judgment motion "must view all facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment." *Wilmington Housing Authority v. Pan Builders, Inc.,* 665 F.Supp. 351, 353 (D.Del. 1987) (citing *Adickes v. Kress Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). Summary judgment is as proper in a patent case as any other case, if the conditions of Rule 56 have been satisfied. *See Chemical Engineering Corp. v. Essef Industries,* 795 F.2d 1565, 1571 (Fed.Cir. 1986); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). *See also Porter v. Farmers Supply Service, Inc.,* 617 F.Supp. 1175, 1179 (D.Del.1985), *aff'd,* 790 F.2d 882 (Fed.Cir.1986).

## III. DISCUSSION

Erbamont contends that summary judgment is not suitable in this case because "[t]o resolve the issue of importation [in section 271(g) ], it is necessary to determine Bristol's intent and purpose in both (a) ordering bulk doxorubicin from Meiji after the date of enactment of the Act, and (b) obtaining delivery before February 23, 1989 of enough doxorubicin to supply 27% of the annual United States market." Answering Brief of Defendant at 13. Erbamont urges that Bristol–Myers' conduct represents a deliberate attempt to circumvent the purposes of the § 271(g) by "stockpiling" the doxorubicin hydrochloride so that it would be present in the United States before the effective date of the statute. *Id.* The Court, however, finds Erbamont's position in conflict with the plain meaning of the statute and unsupported by

---

**8.** Bristol–Myers had previously not paid customs duties on any of the 13 kilograms except for payment on a withdrawal of 0.0044 kilograms on November 2, 1988. All withdrawals to date have resulted from the first 2 kilogram shipment.

any clearly expressed legislative history to the contrary.

### A. The Patent Process Legislation

On August 23, 1988, Congress passed the Omnibus Trade and Competitiveness Act of 1988 (the "Act"), Public Law No. 100–418. The Act added a new subsection to section 271 of the patent statute (title 35).[9] This new subsection, 35 U.S.C. § 271(g), created a new infringement cause of action based upon the importation, sale, or use of a product manufactured abroad by a process protected by a United States patent.[10] Section 271(g) provides in pertinent part:

> (g) Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent.

35 U.S.C. § 271(g).

Section 9006(a) of the Act, however, states that 35 U.S.C. § 271(g) would not be

effective until *six months after* the date of enactment of the Act:

> § 9006 Effective Date
> (a) IN GENERAL.—The amendments made by this subtitle take effect 6 months after the date of enactment of this Act and, subject to subsections (b) and (c), shall apply only with respect to products made or imported after the effective date of the amendments made by this subtitle.[11]

Bristol–Myers received all 13 kilograms of the doxorubicin hydrochloride in the United States prior to the effective date of section 271(g), i.e. prior to February 23, 1989. Consequently, the Court must ascertain whether this receipt avoids the scope of § 271(g).[12]

### B. Appropriateness of Summary Judgment

■ Erbamont's initial argument is that summary judgment is not proper here because the present case calls for the interpretation of a new statutory provision. Answering Brief of Defendant at 14–18.

---

**9.** The addition to Section 271 of Title 35 appears in § 9003 of the Act. Subtitle A of Title IX of the Act was entitled the "Process Patent Amendments Act of 1988". Section 271 of Title 35 relates to the causes of action for infringement of a United States patent.

**10.** Before the passage of the Act, the only remedy a patent process holder had in this situation was with the International Trade Commission ("ITC") pursuant to its authority under 19 U.S.C. §§ 1337 and 1337a. The ITC, however, could only grant non-monetary relief in the form of an *in rem* exclusion order against goods. 35 U.S.C. § 271(g), by its terms, permits a federal district court to award a patent process holder damages for infringement and issue any other relief against an infringer. 35 U.S.C. § 271(g), therefore, provides an *in personam* remedy as compared to the *in rem* remedy of 19 U.S.C. §§ 1337 and 1337a.

**11.** Subsection (b) of § 9006 is a "grandfather provision," which provides the following:

> (b) EXCEPTIONS.—The amendments made by this subtitle shall not abridge or affect the right of any person or any successor in business of such person to continue to use, sell, or import any specific product already in substantial and continuous sale or use by such person in the United States on January 1, 1988, or for which substantial preparation by such person for such sale or use was made

before such date, to the extent equitable for the protection of commercial investments made or business commenced in the United States before such date. This subsection shall not apply to any person or any successor in business of such person using, selling, or importing a product produced by a patented process that is the subject of a process patent enforcement action commenced before January 1, 1987, before the International Trade Commission, that is pending or in which an order has been entered.

Bristol–Myers has not relied upon this provision as a defense to Erbamont's counterclaim. In any event, the record presently before the Court would not appear to establish a viable defense to the counterclaim under the grandfather provision.

**12.** The Court notes that the effective date provision (§ 9006 of the Act) of section 271(g) was not codified in title 35. Section 9006 of the Act refers to "imported" products. The Court decides the present case under the premise that the terms "importation" and "import" in section 271(g) (§ 9003 of the Act) and the term "imported" in section 9006 of the Act have the same meaning. The Court finds nothing in the legislative history which would contradict this premise. Thus, the present decision represents an interpretation of both 35 U.S.C. § 271(g) and its effective date provision, § 9006 of the Act.

Erbamont points out that, to date, no court has construed section 271(g), and therefore this fact should deter the Court from deciding its infringement claim on summary judgment. The Court finds no merit in this contention.

Erbamont bases this argument in part by citation to *Kennedy v. Silas Mason, Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). Answering Brief of Defendant at 15. This case does not lend support to Erbamont's contention; *Kennedy* merely teaches that summary judgment is not proper if it is based upon "an indefinite factual foundation". *Kennedy*, 334 U.S. at 256, 68 S.Ct. at 1034. Likewise, *Miller v. General Outdoor Advertising Co.*, 337 F.2d 944 (2d Cir.1964) adds no credence to Erbamont's position as the Second Circuit only criticized the poor factual record upon which the district court had based its summary judgment disposition. *Id.* at 947. Finally, *Hospital Association of New York State, Inc. v. Toia*, 438 F.Supp. 866, 871 (S.D.N.Y.1977) merely admonishes that a sound factual record is a predicate for disposition of a case by summary judgment. Thus, this Court will not decline to decide Erbamont's counterclaim on summary judgment even though no other court may have rendered a decision interpreting section 271(g).[13]

Erbamont further asserts that the complexity of the present controversy militates against the granting of summary judgment. Answering Brief of Defendant at 17–18. The Court, however, does not view the alleged complexity of the present case as a reason to refrain from summary judgment. A prerequisite for summary judgement disposition is a fully developed factual record.[14] The present case contains an adequate factual foundation upon which this Court can base its decision on the summary judgement motion.

## C. Meaning of "Importation"; "Import"

The heart of the controversy regarding Erbamont's counterclaim lies with the definition to be given the terms "importation" and "import" in § 271(g). If Bristol–Myers "imported" the 13 kilograms before the effective date of § 271(g) (February 23, 1989), then Erbamont has no cause of action under this statute. If, however, the 13 kilograms were not "imported" until after February 23, 1989, Erbamont could still maintain its action under § 271(g).

Erbamont claims that the terms "importation" and "import" mean that the alleged infringing goods (the 13 kilograms of doxorubicin hydrochloride) must have lawfully entered into United States commerce as opposed to being in custody of Customs officials. Answering Brief of Defendant at 20. Bristol–Myers, however, argues that once the alleged infringing goods entered into the territory of the United States and became present in the United States, this constituted "importation" under the relevant provisions of the Act. The plain meaning of the statute and the inconclusive legislative history behind the Act dictate that Bristol–Myers' is the better of the opposing arguments.

### 1. Plain Meaning

The United States Supreme Court has made it abundantly clear that "[t]he starting point in statutory interpretation is 'the language [of the statute] itself.' " *United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). Absent the presence of special circumstances, when the terms of a statute are unambiguous, judicial inquiry is complete. *Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859–1860, 95

13. *See Bell v. United States*, 754 F.2d 490, 495 (3d Cir.1985); *Cox Cable Communications, Inc. v. United States*, 699 F.Supp. 917, 921 (M.D.Ga. 1988); *Grigsby v. Crown Cork & Seal Co.*, 574 F.Supp. 128, 129 (D.Del.1983).

14. *See, e.g., Kennedy*, 334 U.S. at 256, 68 S.Ct. at 1034; *Miller v. General Outdoor Advertising Co.*, 337 F.2d 944, 947 (2d Cir.1964); *Hospital Ass'n. of New York State, Inc. v. Toia*, 438 F.Supp. 866, 871 (S.D.N.Y.1977).

L.Ed.2d 404 (1987). To resolve Erbamont's counterclaim, it is necessary for the Court to determine the meaning of "imports" and "importation" referred to in § 271(g).[15] Black's Law Dictionary defines "importation" by the following:

> IMPORTATION. The act of bringing goods and merchandise into a country from a foreign country. *Cunard Steamship Co. v. Mellon,* 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894.

Black's Law Dictionary (5th ed. 1979).

In the *Cunard* decision noted in *Black's,* the Supreme Court presented the following definition of "importation":

> Importation, in a like sense, consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a custom house is not the essence of the act.

*Cunard Steamship Co. v. Mellon,* 262 U.S. 100, 122, 43 S.Ct. 504, 506–507, 67 L.Ed. 894 (1923). *See also Canton Railroad Co. v. Rogan,* 340 U.S. 511, 515, 71 S.Ct. 447, 449, 95 L.Ed. 488 (1951) ("to import means to bring into the country"). Under the plain meaning of "importation", therefore, Bristol–Myers' receipt of the 13 kilograms of doxorubicin hydrochloride would avoid the scope of § 271(g) because it was imported—brought into the United States—prior to the effective date of the statute.

### 2. Legislative Intent of the Act

Erbamont argues that "importation" as used in § 271(g) should not have its ordinary, plain meaning. Rather, Erbamont contends, that this term has different meanings depending on the purpose of the particular statute. Answering Brief of Defendant at 20 n. 6. This argument is not well taken.

The Supreme Court has stated that "[i]n the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'" *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting *Consumer Product Safety Comm'n. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). Erbamont asserts that the "legislative history of the Act ... show[s] that the term 'imported,' in the context of the patent laws, means that the goods have lawfully entered into U.S. Commerce, which requires the goods to have passed out of the custody and control of United States Customs." Answering Brief of Defendant at 20. This argument derives no support whatsoever from the legislative history of the Act.

The Court is in general agreement with Erbamont's contention that the purpose of the Act "was to put products produced by patented processes on equal footing with products patented *per se* as far as infringement was concerned." Answering Brief of Defendant at 24. It does not logically follow, however, that this "equal footing" compels the term "importation" in section 271(g) to mean "the completion of the process of legally causing the product to pass into the stream of commerce wherein it is capable of being used and sold." Answering Brief of Defendant at 32.

The legislative history of the Act that Erbamont has relied upon in its argument does little more than point out the existing inadequacies of process patent protection before the passage of the Act. *See* Answering Brief of Defendant at 25–29. The legislative history, however, does not establish that Congress clearly intended "importation" in § 271(g) to mean conduct or activity other than that which the plain meaning of the term implies. Likewise, the Court finds that Congress did not intend the term "importation" to turn upon extremely intricate concepts of title and sales contracts.[16]

---

**15.** As mentioned in note 12, this interpretation also includes the term "imported" in § 9006 of the Act, the effective date provision.

**16.** Erbamont asserts that the presence of the doxorubicin hydrochloride in the United States was "conditional" and that there was no intent to transfer title until FDA approval of Bristol–Myers' ANDA for doxorubicin hydrochloride. *See* Answering Brief of Defendant at 35–36.

Erbamont's analogy to the threshold level of activity necessary to create a cause of action for infringement of a product patent is equally tenuous. Answering Brief of Defendant at 29–34. Erbamont more specifically contends that the "importation" of § 271(g) should be interpreted "to constitute the final act of legally injecting goods into the stream of commerce analogous to the completion of a manufacturing process in the United States." Answering Brief of Defendant at 31. As counsel for Bristol–Myers commented at oral argument, Erbamont is attempting to read the requirements of § 271(a) into § 271(g).[17] Section 271(a) requires an act of making, using, or selling of goods protected by a U.S. patent before a cause of action occurs; a cause of action under § 271(g) arises upon mere importation—no sale or use is necessary. These statutes by necessity provide two distinct thresholds for infringing activity for two different reasons. Section 271(a) is directed to activity occurring in the United States, whereas, § 271(g) is directed to activity occurring overseas. Each statute, therefore, must have its own distinct threshold level of activity.

■ In summary, the Court concludes that the terms "importation" and "import" in § 271(g) (and the term "imported" in § 9006 of the Act) are to have their plain ordinary meaning of bringing goods into the United States from another country. This term does not depend on or require an analysis of the intent of the person in bringing the goods into the United States. Furthermore, it is not necessary that the goods in issue have passed through U.S. Customs to be imported under § 271(g) and § 9006 of the Act.

## IV. APPLICATION OF SUMMARY JUDGMENT STANDARD

The Court finds that there is no genuine dispute that Bristol–Myers brought (or caused to be brought) the 13 kilograms of doxorubicin hydrochloride into the United States before February 23, 1989, vis-a-vis its transactions with Meiji Seika. This doxorubicin hydrochloride entered the borders of the United States at Mayaguez, Puerto Rico. Although there is dispute as to the exact time of passage of title, various contingencies involved in the transactions, when payment occurred, and when the goods will ultimately be used or sold, these facts are immaterial. The Court, therefore, finds that Erbamont does not have a cause of action under § 271(g) because none of the 13 kilograms of doxorubicin hydrochloride was imported within the meaning of 35 U.S.C. § 271(g) after its effective date. This statute (and § 9006 of the Act) only requires that the goods be brought into the United States from another country, and Bristol–Myers did this before February 23, 1989.

Although Erbamont strenuously urges the inequities involved in Bristol–Myers' "stockpiling" of doxorubicin hydrochloride prior to the effective date of the Act, there simply is no remedy this Court can provide. Congress, by passing § 271(g) on August 23, 1988 but not making it effective until February 23, 1989, invited the very conduct at issue herein.

## V. ILLEGALITY OF BRISTOL–MYERS' IMPORTATION

Erbamont maintains that the 13 kilograms of doxorubicin hydrochloride that Bristol–Myers received should not be considered "imported" prior to February 23, 1989 because Bristol–Myers had not yet received approval from the FDA to import or sell bulk doxorubicin in interstate commerce. Answering Brief of Defendant at 40–43. See also Surreply Brief of Defendant. Erbamont views this receipt as a violation of the food and drug laws, and thus contends that § 271(g) "should not be construed to allow stockpiles of illegal goods to be exempted from patent infringement." Answering Brief of Defendant at 40.

---

**17.** 35 U.S.C. § 271(a) relates to infringement of a product patent, and provides the following:
  (a) EXCEPT as otherwise provided in this title, whoever without authority makes, uses, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
  35 U.S.C. § 271(a).

The Court squarely rejects these contentions. First, there is no indication that the Act intended "importation" in § 271(g) to be interrelated with FDA approval. More importantly, it is not the function of this Court to determine *sue sponte* violations of the food and drugs laws. The FDA is vested with power to bring both criminal and civil proceedings in response to perceived violations of the food and drug laws. The FDA may very well utilize its prosecutorial discretion and institute such an action against Bristol–Myers in federal court. Until such time, however, it is not appropriate for this Court to be concerned about any non-compliance with the food and drug laws.

## VI. CONCLUSION

The Court holds that there is no genuine dispute as to any material facts surrounding Bristol–Myers' receipt of 13 kilograms of doxorubicin hydrochloride at its facility in Mayaguez, Puerto Rico. This receipt occurred before February 23, 1989. As a matter of law, therefore, Bristol–Myers did not import the 13 kilograms of doxorubicin hydrochloride into the United States within the meaning of 35 U.S.C. § 271(g) after February 23, 1989. Consequently, as a matter of law, this receipt does not provide Erbamont the basis for a cause of action under 35 U.S.C. § 271(g).

The Court has carefully considered Erbamont's arguments, including those not specifically addressed in this Opinion. The Court concludes that Bristol–Myers has met its burden and is entitled to judgment as a matter of law under F.R.C.P. 56(c).

Bristol–Myers' motion for summary judgment of noninfringement is granted and Erbamont's counterclaim is dismissed with prejudice. An order shall be entered accordingly.