**COLLINS & AIKMAN CORP.,**
**Plaintiff–Counterclaim**
**Defendant,**

v.

**STRATTON INDUSTRIES, INC.,**
**Defendant–Counterclaimant.**

**Civ. A. No. C80–32R.**

United States District Court,
N.D. Georgia,
Rome Division.

Dec. 26, 1989.

Lemuel Hugh Kemp, Kinney, Kemp, Pickell, Sponcler & Joiner, Dalton, Ga., William H. Voth, Norman C. Kleinberg, Hughes, Hubbard & Reed, Robert J. Sisk, Office of Robert J. Sisk, New York City, for Collins & Aikman Corp.

Robert Maddox Brinson, Brinson, Askew & Berry, Rome, Ga., Douglas E. Whitney, Matthew B. Lehr, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Stratton Industries.

**MEMORANDUM OPINION**
**AND ORDER**

HAROLD L. MURPHY, District Judge.

After a nine year journey this case may finally be reaching resolution. Presently before the Court is Collins & Aikman's (C & A) second motion for summary judgment on defendant Stratton Industries's (Stratton) counterclaim for antitrust violations.[1]

---

1. Also before the Court is Stratton's motion for leave to file a supplemental brief. The Court GRANTS the motion and notes that the brief was filed simultaneously with the motion.

It should be mentioned, that C & A has twice moved for dismissal of Stratton's antitrust counterclaim and once for summary judgment prior to the instant motion. *Each of those motions*

The history of this litigation is complex and protracted.

In 1980, C & A filed a Complaint in this Court charging Stratton and Compo Industries with patent infringement. In 1984, after a lengthy discovery period, the patent infringement claims went to trial. At the close of C & A's evidence, the Court directed a verdict for Stratton and its co-defendant Compo. Stratton then began to press the counterclaim that it had initially raised in its Answer to C & A's Complaint in 1980.[2] The counterclaim was twice amended and in its final form alleges that C & A brought a sham patent infringement suit against Stratton without any evidence of infringement and with the specific intent of maintaining C & A's monopoly power in violation of 15 U.S.C. § 2.

C & A vigorously disputes Stratton's characterization of its infringement suit as a sham. C & A also asserts that its suit against Stratton was protected by the First Amendment right to petition the government and that Stratton's antitrust counterclaim must therefore be dismissed. The Court agrees, and for the reasons set forth below grants C & A's motion for summary judgment.[3]

## I. CASE HISTORY

### A. Factual Background

In 1967 C & A, a leading carpet manufacturer approached Compo's predecessor, Pandel, Inc.,[4] to obtain assistance in developing a procedure for bonding polyvinyl chloride (vinyl) foam to tufted carpet. After a few months of experimentation, Compo was able to develop and produce a commercially acceptable method of affixing its vinyl foam backing to tufted carpet. The result of this process was a roll of commercially functional vinyl-backed tufted carpet.

Two patents resulted from Compo's discoveries. Patent number 3,560,284 ('284) protected Compo's process for making vinyl-backed tufted carpet, and patent number 3,695,987 ('987) protected the vinyl backed carpet product itself.

Desiring to secure its position in the market as the first and primary distributor of vinyl-backed carpet, C & A sought and obtained an immediate and exclusive license from Compo to use its patents and to provide C & A with scientific and technical know-how. In return, C & A promised to pay royalties, and to maintain in confidence the know-how it acquired from Compo. The parties entered into a licensing agreement in December of 1967 which memorialized their negotiations. The tufted carpet C & A manufactured under its licensing agreement with Compo was marketed as "Powerbond." Powerbond, which was produced and sold as roll goods, was the only vinyl-backed tufted carpet on the market at the time the license agreement was finalized.

Powerbond proved highly successful. C & A desired to expand the use of vinyl-backed carpet by creating a carpet tile, that is, an industrial tufted carpet that could be sold in individual squares and installed in the same manner as traditional vinyl tiles. C & A again turned to Compo for technical and scientific assistance. Initially an attempt was made to cut the Powerbond into tiles, but the resulting product lacked di-

---

was denied. However, in denying C & A's prior motions, none of the issues with which the Court is concerned today was involved. *See,* Orders, of June 25, 1982; December 31, 1982, and June 28, 1985.

**2.** Compo also had a antitrust counterclaim against C & A. However, in 1986 Compo and C & A settled their differences and an Order of Dismissal was entered by this Court on February 14, 1986.

**3.** C & A articulates an alternative ground for summary judgment namely, that Stratton can not establish the necessary elements of its mo-

nopolization claim. The Court does not reach this issue since it dismisses Stratton's counterclaim on First Amendment grounds.

**4.** Pandel, Inc., was incorporated in 1964 under the laws of Massachusetts. Pandel became Pandel–Bradford, Inc., in 1971. In 1977, Pandel–Bradford merged with Compo Industries, Inc., a corporation of the State of Delaware. Compo thus succeeded to all the rights and obligations of Pandel. For purposes of this Order the Court will refer only to Compo in an effort to avoid confusion. With regard to the issues before the Court there is no legal distinction between Pandel and Compo.

mensional stability. By December 1970, however, Compo developed a practical process for making vinyl backed carpet tile. This process was patented by Compo under number 3,728,182 ('182). Without attempting to describe the tile process, suffice it to say that it differs in theory from the Powerbond process.

While C & A did not have the manufacturing facilities necessary to produce the newly developed carpet tile, Compo, at its Cartersville, Georgia plant did have the needed machinery. Consequently, Compo began producing all C & A's carpet tile requirements. The relationship was essentially a symbiotic one. C & A would send tufted carpet to Compo, who would in turn make the carpet tile and then return the finished product to C & A for distribution and sale. Therefore, by 1971 Compo was the exclusive producer of C & A's carpet tile, and all the vinyl backing which C & A added to its tufted carpet and sold in roll form as Powerbond.

In March of 1971, William D. Wiegand, president of C & A's carpet division, visited Compo's Cartersville, Georgia plant. The purpose of the visit was to obtain technical information about the manufacturing process Compo used to produce the carpet tile that C & A was buying. When Wiegand and his associate arrived in Georgia, Compo's plant manager refused to allow them into the plant or to disclose any information concerning the carpet tile process. Compo's plant manager took the position that the process was in the realm of public knowledge, and was therefore something in which Compo lacked proprietary rights, and so, did not fall under the terms of the 1967 license agreement.

Although the parties disagreed on whether the original 1967 license agreement applied to the carpet tile process as well as the vinyl backing applied to Powerbond roll carpet, they nonetheless resolved their dispute. To wit, C & A undertook to buy all its carpet tile requirements from Compo and to pay royalties on both the carpet tile and the Powerbond. In exchange, Compo agreed to preserve C & A's exclusivity.

This relationship functioned well until the fall of 1979. Around September, Compo learned of a rumor that C & A was planning to back carpet tile at its own facility. C & A eventually confirmed the rumor and informed Compo that it had developed its own tile backing process and would therefore be taking care of its own manufacturing needs. By letter dated October 3, 1979, Wiegand informed Compo formally that C & A's purchase of carpet tile would be phased out by a specific date. Compo's reaction was swift.

As early as 1976 Compo had been in contact with Sidlaw Industries (Sidlaw), a Scottish firm that had developed and patented a process for making vinyl backing for tufted carpet tile. Following C & A's announcement that it intended to manufacture its own carpet tile, Compo entered into a license agreement with Sidlaw to use Sidlaw's patents to apply vinyl backing to tufted carpet tile for customers other than C & A. Compo informed C & A of its intention by letter dated November 21, 1979. Compo in early December 1979 executed a license agreement with Sidlaw.

Disturbed by Compo's agreement with Sidlaw, Wiegand wrote to Compo on December 20, 1979, and stated that C & A's counsel had advised the company that Compo's plans to back tufted carpet for C & A's competitors would be a flagrant violation of the 1967 license agreement. The letter went on to say that the violation could not be evaded even if Compo were to use Sidlaw's technology. Because of Wiegand's letter, Compo ceased its manufacture of carpet tiles for C & A.

In January 1980, approximately two months after Compo informed C & A that it intended to apply vinyl backing to tufted carpet for C & A's competitors, Stratton Industries, a carpet manufacture and competitor of C & A, displayed vinyl-backed tufted carpet tile at trade shows in Chicago and Atlanta. Believing that Compo had backed the tufted carpet products displayed by Stratton, and that the Stratton product violated C & A's exclusive right to the patents associated with the 1967 licence

agreement, C & A in 1980 initiated legal action against both Compo and Stratton.

Stratton temporarily withdrew from the carpet tile business in 1980 because of concern over the possibility that it would have to pay damages to C & A.[5] Before reentering the tile market, Stratton insisted that Compo indemnify it against any damages that Stratton might incur because of the litigation brought against it by C & A. After several months of negotiation, Stratton and Compo on October 10, 1980, reached an accord and signed an indemnity agreement. The agreement compelled Compo to indemnify Stratton for any patent infringement damages awarded to C & A by this Court. The agreement also provided that Compo would pay the legal fees of Stratton's attorneys. In return, Stratton agreed that it would use the services of Compo exclusively for the application of vinyl backing on Stratton carpet. The indemnification expressly excluded any cost associated with Stratton's antitrust counterclaim against C & A.

B.  Litigation Background

Obfuscation is the word that best characterizes this litigation. The case began with the filing of two separate complaints. On February 5, 1980, C & A filed a complaint in this Court against Compo and Stratton alleging infringements of patents exclusively reserved for C & A under the 1967 license agreement with Compo. In particular, Stratton was alleged to have infringed the Powerbond patent ('987) by inducing Compo to make and sell vinyl-backed tufted carpet to wholesalers other than C & A. Additionally, Stratton was charged with using and selling carpet covered by the '987 patent. Compo was allegedly guilty of infringing not only the '987 patent but also, the '284 and '182 patents. The complaint requested monetary and injunctive relief against Stratton and Compo.

Compo and Stratton answered the Georgia suit and denied all material allegations of infringement. In addition both asserted antitrust counterclaims against C & A. In essence, the counterclaims challenge the legal validity of C & A's patent infringement action by advancing the theory that the Georgia action was a sham, begun without any basis in fact or law, and intended solely to perpetuate C & A's monopolistic position in the marketplace. Obviously, C & A denied unequivocally the allegations contained in the counterclaims.

On the same day that C & A filed suit in this Court, it also filed an action in the Chancery Court of Delaware against Compo alone. The Delaware action alleged that Compo breached the 1967 license agreement.[6] The substance of C & A's allegations was that Compo violated the license's exclusivity agreement by providing carpet manufacturers other than C & A with vinyl backing for tufted carpet.

In its Delaware complaint, C & A sought a declaratory judgment construing the rights of the parties to the license agreement. It also sought to enjoin Compo from using or supplying know-how that came within the exclusive purview of the license for the benefit of manufacturers other than C & A.

Not to be outdone, Compo and Stratton on July 17, 1981, brought suit against C & A in the United States District Court for the District of Delaware. The Delaware action charged C & A with the same conduct that Stratton and Compo had already asserted in their antitrust counterclaims filed in this Court. Namely, that C & A's real motive in bringing suit in Georgia was an attempt to monopolize the carpet tile market contrary to 15 U.S.C. § 2.

The resolution of the Delaware District Court action is the least significant in terms of resolving the current controversy. Suffice it to say that the District Court refused to rule on Stratton's and Compo's claim that the Georgia action was a "sham." It held that to do so would involve duplication of this Court's efforts,

---

5.  *See,* Bernard Zuckerman's Deposition, April 6, 1989, at 34–56. Mr. Zuckerman is president of Stratton Industries.

6.  Obviously, the Delaware action did not assert any allegations of patent infringement since such claims are the sole prerogative of the federal courts. *See,* 28 U.S.C. § 1338.

and create the possibility of inconsistent results. For that reason the Court stayed the action indefinitely.[7] *Compo and Stratton Industries v. Collins & Aikman Corp.*, No. 81–323, slip op. at 12 (D.Del. Nov. 3, 1981).

Before the Court can resolve C & A's summary judgment motion, consideration must be given to the findings made by the Chancery Court of Delaware. Equally important is a review of the record developed in this Court during the October 1984, trial of C & A's patent infringement action.

### 1. Delaware Chancery Court Decision

After a fourteen day trial and more than a year of post-trial briefing, argument, and deliberation, the Delaware Chancellor rendered a 52–page Memorandum Opinion on July 6, 1982. An additional year of briefing, and argument was required before the Chancellor entered the Order of Judgement on June 24, 1983. This Court "labored mightily" as did all the parties to determine what exactly the Chancellor had decided.[8] One thing is certain however, the Chancellor did not grant C & A the injunctive relief it desired. What then did the Delaware court hold?

The suit before the Delaware court involved a determination of the contractual rights of Compo and C & A under the terms of the 1967 license agreement. The license provided for the payment of royalties by C & A to Compo for the 18 year life of the agreement. It also provided for an annual royalty to be paid by C & A to Compo based on a percentage of "C & A's net selling price" of the "material processed under the Know-how and Patent Rights of [the] Agrement." The language of the license agreement that is particularly relevant to the Delaware decision, and to the resolution of the antitrust issue now before this Court is as follows:

WHEREAS, [Compo] has developed and is continuing to develop certain proprietary and confidential techniques and compositions ... for use in the field of applying synthetic resin backing to carpet products, and particularly in the field of applying vinyl backing to tufted carpet products; and

. . . . .

WHEREAS, C & A desires to be licensed under the know-how and patent rights of [Compo] relating to such techniques, compositions and carpet products.

. . . . .

NOW, THEREFORE, ... the parties hereto agree as follows:

1. As used in this Agreement, the following terms shall be defined as set forth below:

(a) 'Know-how' shall mean all information possessed at any time by [Compo] during the term of this agreement relating to tufted carpet products having synthetic resin backing or related to the field of applying a synthetic resin backing to tufted carpet products.

. . . . .

2. [Compo] hereby grants C & A an exclusive nontransferable ... license ... includ[ing] the right to use ... all processes and compositions coming within the licensed field, and also the right to make, use and sell ... tufted carpet

---

**7.** The Court is not certain, but assumes that the complaint in the Delaware action has subsequently been dismissed.

**8.** In discussing the antitrust counterclaims the Court in 1985 made the following observations:

"[I]t took me a long, long time to fully understand what I finally ruled to be the law in this case with reference to the Chancellor's decision.

If I recall correctly, we had a conference shortly after his decision and both sides felt like they had ... won the case before the Chancellor. And then when his written order came out, it was a long time before we entered an order here that gave preclusive effect to what he had done.

And even after we entered a written order and we had a conference before the trial, I labored mightily with this case in entering the motion for a directed verdict. And I've thought that I was right, else I would not have granted the motion, but I say that to simply point out that it has not been a simple case from the standpoint of the issues before the court."

Transcript of August 26, 1985, in chambers conference at 6.

products coming under the Patent Rights [extended by this agreement.]

3. [Compo] agrees to furnish to C & A all necessary information, such as engineering, technical and chemical specifications possessed by [Compo] relating to the licensed Know-how and Patent Rights, and [Compo] further agrees to supply all further information which may come into the possession of [Compo] during the term of this Agreement.

.　　.　　.　　.　　.

In construing the scope of the license agreement, the Chancellor determined that the parties did *not* intend to limit the terms of the agreement to only the Powerbond process when the agreement was negotiated. *Collins & Aikman Corp. v. Compo Industries, Inc.,* No. 6098 slip op. at 20, 1982 WL 17804 (Del. Chancery Court July 6, 1982). As the Chancellor said, "[t]he conduct of the parties as well as the language [defining know-how] ... makes clear that while the Powerbond process is what everyone had in mind at the time, the license was meant to cover all information and technology that [Compo] might thereafter devise, by way of improvement on the Powerbond process or otherwise, concerning the development of commercially acceptable tufted carpet products having a vinyl backing." *Id.* at 21. In short, the license was intended to cover all information falling under the definition of "know-how" including Compo's newly developed carpet tile process.

The Chancellor rejected Compo's argument that the carpet tile process was covered under a separate oral agreement allegedly worked out between Compo and C & A in a 1971 meeting in New York. What the Chancellor did decide however, was that the parties' conduct over the eight year period between the development of the carpet tile process and C & A's announcement that it intended to "phase out" Compo, modified the 1967 license insofar as the carpet tile product was concerned.[9] This

mutual modification ultimately resulted in the formation of a requirements contract. *Id.* at 48–49.

The modification resulted from C & A's failure to enforce its right under the terms of the license agreement to compel Compo to disclose the know-how associated with the carpet tile process. Instead, C & A agreed to purchase all its carpet tile needs from Compo for the balance of the licensing agreement. In return, Compo guaranteed C & A exclusive right to its carpet tile production and know-how. Compo's guarantee to C & A was contingent upon C & A purchasing all its carpet tile needs from Compo, and paying the royalties called for by the license.

C & A's subsequent decision in 1979 to make its own carpet tile thereby ended the obligation of Compo under the modified agreement relating to carpet tile. Accordingly, C & A surrendered its right to prevent Compo from using the undisclosed carpet tile process for the benefit of manufacturers other than C & A.[10] Therefore, when C & A surrendered its right to Compo's know-how, it also gave up its exclusive right to any patents as they relate to the carpet tile process.

The modification did not, however, affect the original license agreement as it pertained to Powerbond technology and rolled carpet goods. With regard to the disclosed Powerbond technology, the license agreement remained in full force.

### 2. Georgia District Court Decisions

In October 1984, this Court held a trial on C & A's patent infringement claims. At the conclusion of C & A's evidence, and after much deliberation and argument, the Court directed a verdict for the Defendants on all of C & A's contentions. Transcript of October 1984 Trial at 748, *Collins & Aikman v. Stratton and Compo Industries,* No. 80–32R (N.D.Ga. Oct. 19, 1984) (hereinafter TR). The Court's decision was affirmed on appeal to the Federal Circuit.

---

**9.** The modification theory on which the Chancellor rested his ruling was neither briefed nor argued by either side despite the length of the post trial proceedings. *Id.* at 51.

**10.** *See,* Order of Judgment entered in the Chancery Court of Delaware at 2–4 July 24, 1983.

*Collins & Aikman v. Stratton and Compo Industries,* 776 F.2d 1063 (Fed.Cir. 1985).

Thereafter Compo and Stratton began pursuing their antitrust counterclaims. After several years, Compo and C & A settled,[11] leaving only Stratton to prosecute the counterclaim. The Court's reasoning in granting C & A's summary judgment motion will be apparent only after a review of the October 1984, trial, and the Court's resolution of several motions by Stratton and Compo related to the October trial.

### a. Pretrial Motions
#### i) Stratton's Motion for Summary Judgment
and
#### C & A's Motion for Reconsideration

On June 30, 1981, this Court entered an Order granting Stratton summary judgment on C & A's infringement claim. *Collins & Aikman v. Stratton and Compo Industries,* slip op. at 6, No. 80–32R (N.D.Ga. June 30, 1981). The Court based its ruling on a determination that C & A could not show, as it contended, that Stratton induced Compo to breach the Powerbond patent. The Court stated the applicable law as follows:

> To actively induce patent infringement is to aid and abet an infringement by another. Thus, there must be an act of infringement before there can be a cause of action for an inducement to infringe. Such act of infringement must have been committed after issuance of the patent and before commencement of the infringement suit. (Citations omitted).

*Id.* at 4.

On the evidence before it, the Court concluded that the alleged infringement took place no earlier than June or July of 1980. The infringement lawsuit was filed February 5, 1980. Thus, the Court determined that the acts of infringement which were alleged in the Complaint occurred after the filing of the infringement action. Accordingly, the Court found that C & A could not establish inducement to infringe and actual infringement prior to bringing the suit. The Court specifically advised C & A that if it had additional evidence that would enable it to make the requisite showing, it should file a motion for reconsideration. *Id.* at 5.

C & A did just that, and on December 31, 1982, the Court vacated its earlier order granting Stratton summary judgement. *Collins & Aikman v. Stratton and Compo Industries,* slip op. at 5, No. 80–32R (N.D.Ga. Dec. 31, 1982). In convincing the Court to vacate its June 30, 1981, Order, C & A relied upon an answer to an interrogatory propounded to Compo in Delaware Chancery Court. In answering C & A's interrogatory, Compo responded that it had applied synthetic resin backing to tufted carpet material supplied by Stratton on at least two occasions, one of those occasions being January 1980. However, Compo, in an identically worded interrogatory filed in this Court, answered that it had not backed carpet for Stratton. The resulting contradiction creating a conflict in the evidence that the Court concluded "gave rise to a question of fact as to whether Stratton took part in any act of patent infringement prior to the institution of this lawsuit on February 5, 1980." *Id.* at 4. Therefore, the Court held that C & A proffered enough evidence to creat a question of fact strong enough to withstand a motion for summary judgement.

#### ii) Compo's Motion for Partial Summary Judgement

Immediately before trial, on September 20, 1984, this Court issued an Order denying Compo's motion for partial summary judgment. *Collins & Aikman v. Stratton and Compo Industries,* slip op. at 4, No. 80–32R (N.D.Ga. Sept. 20, 1984). The essence of Compo's motion rested on what it perceived to be the logical extension of the Delaware Court's interpretation of the 1967 license agreement. Compo argued that if by their conduct, the parties modified the license agreement to eliminate C & A's exclusive right to Compo's carpet tile processes, then C & A lost whatever patent

---

**11.** *See supra,* at note 2.

rights it had under the agreement as well. The Court agreed to the extent that any at issue patents related *exclusively* to the production of carpet tile. The Court denied Compo's motion however, because it determined that C & A's claim had merit to the extent that C & A insisted that Compo was producing rolled carpet goods for companies other than C & A by using tile technology. *Id.* at 7.

To the extent that this was true, there remained triable issues. The Court did admonish the parties "that in its view C & A [was] entitled to recover only for improper actions taken by Compo in regard to this narrow band of products." *Ibid.* The Order went on to state, that "[n]o liability [would] attach for those products that can be shown to fall within the category of carpet tile." *Ibid.*

### b. The Infringement Trial

On October 15, 1984, C & A's patent infringement claim finally reached trial. For five days C & A presented its evidence. At the close of C & A's case, Stratton and Compo moved for a directed verdict dismissing C & A's compliant in its entirety. The Court granted the motion.[12] Stratton now points to the decision to direct a verdict as evidence that C & A's suit against it was brought in bad faith. The Court does not agree with Stratton's interpretation of the decision to direct a verdict.

The directed verdict motion was based upon two grounds. First, that C & A had did not make out a prima facia case of infringement; and second, any infringement that might have occurred was *de minimis*. TR. at 737. The Court granted the motion upon each of these grounds.

To explain the Court's reasoning for granting the motion, a lengthy Order was dictated into the record. *Id.* at 737–50. It

began by reviewing the Order of the Chancery Court in some detail, paying particular attention to the Chancellor's findings concerning the legal relationship between Compo and C & A. In essence, preclusive effect was given to the Chancellor's decision that C & A and Compo·had modified their 1967 license agreement with respect to carpet tile. The Court then made the following specific findings concerning the pending patent infringement claims.

[U]nder the evidence before the Court, [C & A] has failed to show any infringement of the patents before the Court because of the modification of the license agreement between the parties which allowed the use of the patents at issue by Compo and the manufacture and marketing of carpet tile and carpet tile backing so long as the same was not utilized for the making and marketing of roll goods.

The evidence discloses that in each of the three instances in which carpet was marketed by Stratton in rolls, which had been manufactured by the tile process,[13] that the same was not known by Compo to have been marketed by Stratton in rolls until long after such occurrences took place.... The evidence fails to show ... that Stratton induced Compo to manufacture such goods as roll goods for the purpose of distributing [the] same as roll goods.

Additionally, such manufacture and distribution is so insignificant as to be without merit and to bring it within the scope of the *de minimis* rule. [W]ith reference to the *de minimis* rule, the Court finds that the principal officer of the defendant Stratton has testified without equivocation that such activity ceased in late 1983 and would not at any time be done again in the future.

*Id.* at 747–48.

It is clear from the language quoted above, that the Court found evidence of

---

**12.** It should be noted that the motion for directed verdict was made twice. The motion was first made at the conclusion of C & A's evidence on October 18, 1984. The parties argued the motion orally for several hours. The Court then took the motion under advisement, and the next morning denied it. That same day—October 19, 1984—Compo's attorney requested, and the Court granted him the right to reargue the

motion. After several more hours of argument and deliberation, the Court concluded that the motion should be granted.

**13.** Burton M. Gold, Stratton's Chief Executive Officer, testified that Stratton shipped uncut carpet tile in roll form on three different occasions in 1983. TR at 496–97. (Footnote added)

infringement, albeit *de minimis,* on three occasions when Stratton sold uncut rolled goods manufactured by Compo's tile technology. This determination is exactly what the Court's September 20, 1984, Order required C & A to establish. The Court concluded that the infringement was *de minimis* based on the testimony of Burton Gold, Stratton's chief executive officer. Mr. Gold testified that Stratton had not shipped uncut tile in roll form since late 1983 and did not intend to do so in the future. *Id.* at 496. *De minimis* or not, clearly the Court found that Stratton had infringed. Stratton disagrees.

Stratton argues that the Court's Order directing a verdict conclusively determined that "no infringement had occurred." They point to the language in the Court's Order that states "under the evidence before the Court, [C & A] has failed to show any infringement of the patents ... because of the modification of the license agreement between the parties...." *Id.* at 747. This language is more appropriately directed at the claim against Compo than the infringement suit against Stratton. This should be particularly evident given the express finding that Stratton infringed the patents exclusively belonging to C & A on three separate occasions.

Stratton contends that the Court did not find it had sold roll goods but that it had sold uncut carpet tile, thus bringing the actions of Stratton outside the "narrow band of products" that this Court indicated C & A must establish if it wished to litigate this matter. This Court never expressly found that the three instances of roll goods being sold by Stratton were uncut carpet tile. In fact, the Court pretermitted that issue. In explaining the decision to direct a verdict, the Court made the following observation.

> The Chancellor did not find that there was any modification of the license agreement and the exclusive rights of Collins & Aikman with reference to what are described as roll goods. Without making any finding as to whether or not

the three instances in which carpet—there was testimony about carpet being sold by Stratton as roll goods. The Court has found that those instances are so insignificant as to not authorize consideration by the Court and I am dismissing that portion of the case under a legal rule known as the *de minimis* rule.

*Id.* at 749–50.

Obviously, had the Court felt strongly that the instances of roll goods involved here were definitively uncut carpet tile it would have made no sense to direct a verdict on *de minimis* grounds. The *de minimis* defense is based on a showing that the infringing activity is insignificant and that it was terminated at the *de minimis* stage. *Imperial Chemical Industries v. Henkel,* 545 F.Supp. 635, 656–57 (D.Del. 1982). Clearly, a ruling on the *de minimis* doctrine precludes Stratton's argument that no infringement occurred. The fallacy of Stratton's argument is evidenced by the decision of the Court concerning Compo's and Stratton's request for attorneys fees following the directed verdict.

### c. *Request for Attorneys Fees*

Following trial Compo and Stratton moved for attorneys fees pursuant to 35 U.S.C. § 285.[14] This section allows the Court, in its discretion to award attorneys fees to a prevailing party in exceptional cases. Compo and Stratton argued that C & A brought suit against them bad faith without any evidence of actual infringement within the "narrow band" described by this Court's September 20, 1984, Order. The Court denied the motion for attorneys fees based on "the fact that [C & A] did present evidence of the manufacture of carpet goods within the narrow band of products spoken of in the Court's [September 20] order." *Collins & Aikman v. Stratton and Compo Industries,* slip op. at 2, No. 80–32R (N.D.Ga. March 6, 1985) (footnote omitted). In a footnote, the Order specifically stated that "[C & A] presented evidence establishing three ... instances of infringement ... [which fell] within the

---

**14.** Stratton was already assured of receiving its attorney's fees pursuant to the indemnity agree-

ment which Compo and Stratton signed on October 10, 1980. *See supra,* at 1572–73.

scope of the *de minimis* rule." *Id.* at 2 n. 1.

## II. STRATTON'S ANTITRUST COUNTERCLAIM

The gravamen of Stratton's antitrust counterclaim is that C & A sued Stratton for infringement of the '987 Powerbond patent without any evidence of infringement, and with the specific intent of maintaining its monopoly power in the tufted carpet tile market. Stratton's claim is that C & A brought a "sham" suit against it for anticompetitive purposes in violation of the Sherman Act.[15] Stratton does not advance a single anticompetitive act of C & A other than bring the infringement suit.

C & A moves for summary judgment on the grounds that its litigation against Stratton is immune from antitrust liability under the *Noerr–Pennington* doctrine. It is based on this doctrine that the Court grants C & A's motion.

### A. Applicable Substantive Law

#### 1. The Noerr–Pennington Doctrine

■ A long line of Supreme Court cases has secured in our jurisprudence the notion that legitimate efforts to influence the government and courts to take anticompetitive actions cannot be the basis for antitrust liability. This immunity from antitrust liability is generally called the *Noerr–Pennington* doctrine. This name derives from the two leading cases that established the right to use governmental process despite the prohibitions of the Sherman Act. *United Mineworkers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Fights, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In 1972, the Supreme Court specifically extended this antitrust immunity to court actions having an anticompetitive result. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Therefore, though a suit brought to protect pat-ents or enforce exclusive license agreements may have anticompetitive consequences, such action is often protected against antitrust liability.

The *Noerr–Pennington* doctrine rests upon a party's First Amendment right to petition the government. Access to the courts is one form of the right to petition. *California Motor*, 404 U.S. at 510, 92 S.Ct. at 611 ("The right of access to the courts is indeed but one aspect of the right to petition."). This right cannot be abridged despite the party's intent or anticompetitive purpose. *St. Joseph's Hosp. v. Hospital Corp. of America*, 795 F.2d 948, 955 (11th Cir.1986); *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 542 (5th Cir.1978).

The Supreme Court has not, however, left uncircumscript the right to petition the courts. Accordingly, the First Amendment protects only the filing of legitimate claims. *California Motor*, 404 U.S. at 510–11, 92 S.Ct. at 611–12. If the purpose for bringing suit is "nothing more than an attempt to interfere directly with the business relationship of a competitor [then] application of the Sherman Act would be justified." *Noerr Motor*, 365 U.S. at 144, 81 S.Ct. at 533. Whether a suit is legitimate under the *Noerr–Pennington* doctrine depends on whether it is determined to be a sham.

The dimensions of the sham exception are not precisely defined. *See generally*, P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 203.1 at 13–27 (1988). Nevertheless, this Court is guided by the principle that the sham exception should not be so broadly defined as to vitiate the First Amendment benefits of the *Noerr–Pennington* doctrine. In the litigation context, the sham exception is more readily susceptible to definition. In its most restrictive interpretation, a "sham" is the improper invocation of the legal process to injure a competitor by the invocation itself and without any expectation of obtaining a favorable decision. In short, a sham suit would be an

---

**15.** The arguments advanced by Stratton in opposition to C & A's motion for summary judgment are in large measure identical to the arguments which Stratton and Compo asserted in their petition for attorneys fees. Namely, that C & A brought the Georgia action without evidence of infringement. *See,* Stratton's Brief in Support of Attorneys Fees at 13–17 (Nov. 13, 1984).

"abuse" of the judicial process. *California Motor*, 404 U.S. at 513, 92 S.Ct. at 613. The fact that a suit is baseless can be evidence that it is a sham. *Id.* Moreover, a single baseless lawsuit is sufficient to constitute a sham. *Feminist Women's Health Center*, 586 F.2d at 543 n. 6.

One thing is certain, the intention to harm a competitor is *not*, alone, sufficient grounds for the Court to find that a suit is a sham. Supreme Court cases are replete with references that anticompetitive motives do not *per se* eliminate *Noerr–Pennington* immunity.[16] The requisite motive for establishing a sham exception is the intent to harm one's competitor not by the result of the litigation but "by the simple fact of the institution of litigation." *MCI Communications v. AT & A*, 708 F.2d 1081, 1156 (7th Cir.1983). Thus, the touchstone of the sham exception is whether "the desire for relief was a significant factor underlying the actual bringing and prosecution of the suit." *In re Burlington Northern, Inc.*, 822 F.2d 518, 528 (5th Cir.1987).

### 2. Summary Judgment Standard

The Court's sole function on a motion for summary judgment is to determine whether there is a genuine issue for trial. Fed.R. Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The standard is essentially the same as the directed verdict standard: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

The moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, it is not part of the Court's function to decide issues of genuine material fact, but solely to determine whether there is such an issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). It is the applicable substantive law that will identify those facts that are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Facts which in good faith are disputed, but that do not resolve or affect the outcome of the suit will not properly preclude the entry of summary judgment. *Ibid.* In short, such facts are not material. The materiality of a fact rests solely on the governing substantive law. It follows, that on a summary judgment motion, any heightened evidentiary requirements imposed by the relevant substantive law must be applied. *Anderson*, 477 U.S. at 254–56, 106 S.Ct. at 2513–14.

In antitrust cases, summary judgment may be particularly appropriate due to the chilling effect litigation can have on legitimate competition. *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir.1988), *citing, Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "For this reason, when opposing a motion for summary judgment, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was consistent with permissible competition as with illegal conduct." *Ibid.*

### 3. Substantive Patent Law

In this case, the relevant substantive law establishes that C & A, as patentee, is

---

16. For example see, *Allied Tube Corp. v. Indian Head*, 486 U.S. 492, ——, 108 S.Ct. 1931, 1937, 100 L.Ed.2d 497, 505–06 (1988); *Noerr Motor*, 365 U.S. at 138–39, 81 S.Ct. at 530; *Pennington*, 381 U.S. at 669, 85 S.Ct. at 1593; ("Nothing could be clearer from the Court's opinion than that anticompetitive purposes did not illegalize the conduct there involved."); *California Motor*,

404 U.S. at 515, 92 S.Ct. at 614; *see also, St Joseph's Hosp.*, 795 F.2d at 954; ("The [Supreme] Court [has] recognized the rights of the people to petition their government even if they only had anti-competitive motive."); *I.T.T. Corp. v. United Telephone Co.*, 550 F.2d 287, 289 (5th Cir.1977) (per curiam).

presumed to have brought its infringement action in good faith. *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850 (1st Cir.1985); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.1979). This presumption is rebutted only by clear and convincing evidence. *Raytheon Co.*, 769 F.2d at 849–50; *Ethicon, Inc.*, 601 F.2d at 996 ("patentee's infringement suit is presumptively in good faith and this presumption can be rebutted only by clear and convincing evidence.").

The *Raytheon* court considered the relationship between an infringement action, antitrust liability [17] and the corresponding burden of proof.

> [A] patentee who has a good faith belief in the validity of a patent will not be exposed to antitrust damages even if the patent proves to be invalid, or the infringement action unsuccessful. The requirement of clear and convincing evidence is intended to prevent a frustration of the patent laws. It also ensures the free access to the courts by honest patentees to protect their patents without undue risk of incurring liability for asserting their rights.

*Raytheon Co.*, 769 F.2d at 850.

Clearly Stratton would have to prove by clear and convincing evidence that C & A's suit against it was a sham. Only if Stratton can produce this quality of evidence would it be entitled to proceed to trial on the antitrust counterclaim. The Court is certain that clear and convincing evidence that C & A's infringement suit was a sham does not exist.

## III. DISCUSSION

■ The Court has reviewed in some detail all the allegations raised by Stratton that it believes preclude the entry of summary judgment. The Court remains unconvinced that there is sufficient evidence to raise a jury question as to the good faith of C & A in bringing an infringement action against Stratton.

Stratton bases its counterclaim largely on the assertion that C & A knew or should have known that Stratton was not infringing when C & A filed its patent infringement complaint. Stratton points to the fact that C & A had not obtained a sample of its carpet tile at the January 1980 trade shows before it filed suit. It was the appearance of carpet tile at this trade show that launched C & A's suit against Compo and Stratton. C & A's failure to obtain a sample of Stratton's carpet tile does not mean that its suit against Stratton was a sham. The identical appearance of the tufted carpet tile offered by Stratton at the January 1980 trade show and that backed by Compo for C & A, gave C & A reason to believe that its patent had been infringed.

*Bolt Associates, Inc. v. Rix Industries*, 1973–1 Trade Cas. (CCH) ¶ 74,474 (N.D.Cal. 1973), is factually similar to the instant case. In *Bolt*, the court was confronted with an antitrust counterclaim that arose out of a patent infringement suit. The patent action was dismissed since any alleged infringement was *de minimis*. This

---

**17.** The confluence of antitrust law and patent law presents the Court with "two conflicting bodies of law" *Ethicon, Inc.*, 601 F.2d at 992. On the one hand, patent law is concerned with the creation of a statutory grant of monopoly power. On the other hand, the antitrust law is concerned with proscribing monopolistic power. The *Ethicon* court fully grasped this relationship when it wrote:

> The power to exclude, which is the essence of every patent, is monopoly power. Hence, '[a]ny action to enforce a patent is in a very explicit sense exclusionary....' The antitrust laws ... proscribe certain types of exclusionary conduct that threaten or create monopoly power.... It therefore is necessary to reach accommodation between the patent and antitrust laws whenever antitrust liability is prem-

ised on a finding regarding a patentee's intent to monopolize.... To determine the existence of section 2 liability properly requires careful distinctions between lawful patent-related exclusionary conduct ... and unlawful patent-related exclusionary conduct ...; only unlawful patent related exclusionary conduct or intent is evidence of an intent to monopolize.... The task then is to 'identify the point at which ... [an attempt to enforce a patent], always exclusionary in ... [the] literal sense, ... become[s] so intractable as to warrant its being called exclusionary in the sense relevant to the establishment of a Section 2 violation....'

> ...."

*Id.* at note 10 (citations omitted).

left only the defendant's antitrust counterclaim. In that claim, it was asserted that Bolt had attempted to monopolize trade in specialized pneumatic seismic devises in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by "bringing oppressive and unwarranted litigation."

The Court pointed out that "the bringing of infringement suits based on colorable similarity rather than on exact identity are lawful acts, and constitute the sort of aggressive competition and promotion that antitrust laws seek to protect, particularly within the limits of lawful monopolies granted by Congress...." *Ibid., quoting, Drop Dead Co. v. Johnson*, 326 F.2d 87, 96 (9th Cir.1963). Stratton's president Bernard Zuckerman during a deposition confirmed that Stratton's and C & A's carpet tiles were virtually identical in appearance. Zuckerman Feb. 9, 1981 Dep. at 59–60. Thus, Stratton's contention that since C & A did not inform itself of the exact composition of Stratton's carpet tile, that its infringement suit was a sham is without merit.

Stratton also points to the fact that in early 1981, C & A warned Bigelow Industries, a well known commercial carpet manufacturer, that if it did not stay out of the tufted carpet tile market that it too would be sued. Stratton believes that this "warning" is further evidence of C & A's real intention with regard to monopolizing the carpet tile market. Stratton's claim is, however, without merit.

C & A's alleged threats to sue Bigelow if it infringed a patent to which C & A had exclusive rights is protected under the *Noerr–Pennington* doctrine. *See, e.g., Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir.1983); *Rohm and Hass Co. v. Dawson Chemical Co., Inc.*, 557 F.Supp. 739, 842 (S.D.Tex.) (and cases cited therein), *rev'd on other grounds*, 722 F.2d 1556 (5th Cir.1983). As long as the threat was made in good faith for the principal purposes of protecting against any potential infringement it is not evidence of an "evil motive."

Stratton has not pointed to any evidence that seriously suggest the opposite. In late 1979, Compo informed C & A that it would provide carpet tile backing for both Stratton and Bigelow. Given this announcement, C & A was understandably concerned with potential infringement. Thus, the warning to Bigelow is consistent with C & A's rights to protect its patent interests.

This Court is convinced that C & A had a legitimate desire for judicial relief when it filed suit against Stratton, and that such desire was a significant motivating factor in C & A filing its complaint. Stratton simply cannot meet its burden of proving by clear and convincing evidence that C & A's action against it was a sham. The most telling evidence is that this Court has twice ruled that Stratton infringed the patents belonging to C & A, albeit *de minimisly*. When Stratton moved for attorneys' fees it had every incentive to persuade the Court that C & A's suit was frivolous and brought in bad faith. Stratton did not persuade the Court then and it has failed now. The same arguments that were asserted then have been reasserted in this instance. The added discovery allowed Stratton on the antitrust counterclaim has not produced sufficient evidence of bad motive to carry Stratton's burden in the face of *Noerr–Pennington*.

This case has been complicated from its inception. The Court has struggled over the years with many intricate factual and legal issues that have accompanied this litigation. The Court hopes that, at long last, this Order may put to rest a case whose time has come and gone long ago.

ACCORDINGLY, C & A's motion for summary judgment is GRANTED on *Noerr–Pennington* grounds.

IT IS SO ORDERED.