ARES–SERONO, INC., Serono Laboratories Inc., Applied Research Systems ARS Holding N.V., and Genzyme Corporation, Plaintiffs,

v.

ORGANON INTERNATIONAL B.V. and Organon, Inc., Defendants.

Civ. A. No. 92–11982–NMG.

United States District Court, D. Massachusetts.

Jan. 14, 1994.

See also 153 F.R.D. 4.

Dale A. Malone, John P. Iwanicki, Dennis D. Allegretti, Allegretti & Witcoff, Ltd., Boston, MA, Grantland G. Drutchas, Daniel A. Boehnen, Allegretti & Witcoff, Chicago, IL, for plaintiffs.

Berj A. Terzian, Isaac Jarkovsky, Jennifer Gordon, Scott B. Familant, Pennie & Edmonds, New York City, Alexander H. Pratt, Jr., Peabody & Arnold, Boston, MA, for defendants.

*REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION TO DISMISS (DOCKET ENTRY # 7); DEFENDANTS' RENEWED MOTION TO DISMISS (DOCKET ENTRY # 36)*

*ORDER RE: DEFENDANTS' MOTION TO QUASH DISCOVERY PERTAINING TO RECOMBINANT MUTANTS OF HUMAN FOLLICLE STIMULATING HORMONE (DOCKET ENTRY # 106); DEFENDANTS' MOTION FOR SUPPLEMENTAL PROTECTIVE ORDER (DOCKET ENTRY # 124); DEFENDANTS' FIRST MOTION TO COMPEL DISCOVERY (DOCKET ENTRY # 109)*

BOWLER, United States Magistrate Judge.

On August 24, 1993, defendants Organon International B.V. ("OIBV") and Organon, Inc. ("Organon") (collectively: "defendants") filed a motion to compel discovery. (Docket Entry # 109). Plaintiffs Ares–Serono, Inc.,

Serono Laboratories, Inc., Applied Research Systems ARS Holding N.V., and Genzyme. Corporation (collectively: "plaintiffs") oppose the motion. (Docket Entry # 126). Defendants also filed a motion to quash plaintiffs' discovery pertaining to research sponsored by Organon (Docket Entry # 106) which plaintiffs oppose (Docket Entry # 127). Finally, defendants move to supplement the protective order entered in this case. (Docket Entry # 124). Plaintiffs oppose any supplementation. (Ares–Serono's Opposition to Organon's Motion for a Supplemental Protective Order, No Docket Entry No. Assigned).

On November 15, 1993, this court held a hearing and took the discovery motions (Docket Entry ## 106, 109 & 124) under advisement. (Docket Entry # 129). At the request of counsel, this court also took defendants' motion to dismiss (Docket Entry # 7) and their motion to renew their motion to dismiss (Docket Entry # 36) on the papers.[1]

## BACKGROUND

According to the Second Amended Complaint (Docket Entry # 17), plaintiff Applied Research Systems ARS Holding N.V. is the exclusive licensee of U.S. Patent No. 4,923,-805 ("the '805 patent"); issued by the United States Patent and Trademark Office on May 8, 1990. The '805 patent involves biologically active human fertility follicle stimulating hormone ("FSH") which includes alpha and beta subunits. (Docket Entry # 17, Ex. A). In Count I plaintiffs charge defendants with past infringement of the '805 patent by producing a recombinant follicle stimulating hor-

mone ("rFSH")[2] outside the United States comprising alpha and beta subunits of FSH and then importing the rFSH into the United States for commercial purposes in violation of 35 U.S.C. § 271(g).

Count II alleges that Organon's manufacture, use or sale of rFSH in the United States and/or its importation of rFSH into the United States infringes the '805 patent. Plaintiffs therefore seek a declaration that such acts constitute an infringement of the '805 patent. (Docket Entry # 17).

In Count IV,[3] plaintiffs seek a declaration that Organon's manufacture, use or sale of rFSH in the United States and/or its importation of rFSH into the United States infringes U.S. Patent No. 5,156,957 ("the '957 patent"). Entitled "Follicle Stimulating Hormone," the '957 patent claims an alternate method of producing rFSH using expression vectors separately encoding alpha and beta subunits. Count IV seeks declaratory relief with respect to the '957 patent. (Docket Entry # 17 & Ex. B).

The '805 patent uses a single expression vector to encode alpha and beta subunits of FSH ("one vector process"). The '957 patent uses separate expression vectors each encoding the alpha or beta subunit of FSH ("two vector process"). (Docket Entry # 17).

Defendants admit they are engaged in activities in the United States concerning the development of an rFSH product. (Docket Entry # 17, ¶ 29; Docket Entry # 71, ¶ 29). OIBV further admits that it produced an

---

1. The full caption of the motion to dismiss (Docket Entry # 7) is: Defendants' Motion to Dismiss for: (1) Dismissal of Count I of the Complaint with respect to All Defendants Based on the Court's Lack of Personal Jurisdiction; (2) Dismissal of Count II of the Complaint with respect to Organon International B.V. and Organon Teknika Corporation Based on the Court's Lack of Personal Jurisdiction; (3) Judgment of Non–Infringement of the '805 Patent with respect to Count I of the Complaint under the Doctrine of *De Minimis Non Curat Lex* and 35 U.S.C. § 271(e)(1); and (4) a Stay of Discovery, Except for Discovery, if any, Which is Limited to Resolving the Instant Motion. The full caption of the renewed motion to dismiss (Docket Entry # 36) is: Defendants' Notice and Motion to: (1) Renew their Motion of October 13, 1992; (2) Dismiss Count III of the Second Amended Complaint

with respect to All Defendants Based on the Court's Lack of Personal Jurisdiction; (3) Dismiss Count IV of the Second Amended Complaint with respect to Organon International B.V. and Organon Teknika Corporation Based on the Court's Lack of Personal Jurisdiction; and (4) Grant a Stay of Discovery, Except for Discovery, if any, Which is Limited to Resolving the Instant Motion.

2. Defendants represent that rFSH is created by genetically altering living organisms using techniques commonly known as gene splicing or genetic engineering. (Docket Entry # 73).

3. By joint stipulation, the parties dismissed Count III in February 1993. (Docket Entry # 69).

rFSH product outside the United States containing expression vectors encoding alpha and beta subunits. (Docket Entry # 17, ¶ 33; Docket Entry # 71, ¶ 33). Defendants also concede that they undertook preinvestigative new drug animal studies of rFSH in the United States and human studies abroad of rFSH to obtain regulatory approval to manufacture and. sell an rFSH product produced from a two vector cell line in the United States. (Docket Entry # 9; Docket Entry # 17, ¶¶ 37 & 46; Docket Entry # 39, ¶¶ 37 & 46; Docket Entry # 71, ¶ 46).

Plaintiffs represent that defendants initially produced an rFSH product through a one vector method. After learning of the '805 patent, defendants purportedly began developing a two vector method to produce an rFSH product for the purpose of eventually marketing the product in the United States. As an affirmative defense confirmed in its answers to interrogatories, OI represents that it is preparing an investigational new drug application ("IND") to prepare a new drug application ("NDA") for filing with the Food and Drug Administration ("FDA"). (Docket Entry # 39, ¶ 50; Docket Entry # 94, Ex. B, ¶ 18). Organon's President confirms that Organon intends to seek FDA approval for an rFSH product produced by the two vector process. (Docket Entry # 10, ¶ 5).

Defendants generally submit that their research and development activities are protected under 35 U.S.C. § 271(e)(1) ("section 271(e)").[4] Defendants seek a declaration that their activities of importing, manufacturing, using and/or selling rFSH to develop and to submit information to the FDA for obtaining approval of defendants' rFSH product do not infringe the '805 and '957 patents in light of the safe harbor of section 271(e). Defendants and plaintiff are competitors in the field of developing drugs to treat infertility.

## I. *DEFENDANTS' FIRST MOTION TO COMPEL DISCOVERY (DOCKET ENTRY # 109)*

Defendants seek to compel plaintiffs to supplement their answers to interrogatory numbers 11 and 12 of defendants' first set of interrogatories and to produce certain documents in response to defendants' first set of requests for production of documents. Defendants' motion involves the following categories of material: (1) information developed by plaintiffs after the filing of the '805 patent; (2) plaintiffs' efforts to secure additional patents concerning recombinant dimeric proteins other than rFSH, i.e., human luteinizing hormone ("hLH") and chorionic gonadotropin ("hCG"); and (3) plaintiffs' patent application for U.S. Patent No. 4,840,896 ("the '896 patent") and three abandoned patent applications, i.e., U.S. Application Serial No. 016,673 ("the '673 application"), which is a continuation in part of U.S. Application Serial No. 811,959 ("the '959 application"), which is a continuation in part of U.S. Application Serial No. 548,211 ("the '211 application").

■ Turning to the first category of information, defendants maintain that plaintiffs should produce information relating to plaintiffs' testing and selecting of host cells and expression vectors to produce rFSH after the filing date of the patents in suit. Defendants contend that plaintiffs' decision to test and select different expression vectors for rFSH production after they filed the '805 patent implicates the issue of whether one skilled in the art could practice the claimed invention. Consequently, defendants reason that such information is relevant to the issue of utility, operability and enablement of the '805 patent. (Docket Entry # 110).

This court disagrees. According to plaintiffs' answer to interrogatory number four, the effective filing date of the patents in suit is January 30, 1985. (Docket Entry # 126, Ex. A). Enablement, i.e., whether the patent "enables one skilled in the art to make and use the claimed invention," is determined at the time "of the filing of the patent application." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *Phillips Petro-*

---

**4.** Section 271 provides a safe harbor for activities "reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use or sale of drugs." 35 U.S.C. § 271(e)(1).

*leum Company v. U.S. Steel Corporation,* 673 F.Supp. 1278, 1291 (D.Del.1987), *affm'd,* 865 F.2d 1247, 1251 (Fed.Cir.1989) ("post-filing developments in the art are irrelevant to the enablement inquiry").

Similarly, utility and operability under 35 U.S.C. § 101, which implicate whether the claimed invention is useful and operable, relate to the sufficiency of the patent application at the time of filing. Assessing utility requires interpreting the claim in order to define the invention and then testing the invention for utility. *Raytheon Company v. Roper Corporation,* 724 F.2d 951, 956 (Fed. Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). "Utility must be determined as of the date of the invention." *Banning v. Southwestern Bell Telephone Company,* 384 F.Supp. 831, 837 (S.D.Tx.1974). Whether a claimed invention is capable of being used to effectuate and accomplish the object proposed or is a useful advance necessarily requires an interpretation and analysis of the claim at the time of filing.

Absent further authority forthcoming from defendants,[5] discovery of information occurring after the filing date is not relevant to the defenses cited by defendants. *See generally Micro Motion, Inc. v. Kane Steel Company, Inc.,* 894 F.2d 1318, 1325–1328 (Fed. Cir.1990) (discussing relevance and denying speculative inquiry).

■ Turning to the second and third categories of information, defendants argue that plaintiffs' efforts to secure additional patents for LH and hCG involve a common subject matter in relation to the patents in suit. Defendants further submit that the claims in the '211, '956 and '673 applications and in U.S. Application Serial No. 548,228 ("the '228 application"), which issued as the '896 patent, implicate concerns of double patenting.[6] (Docket Entry # 110). Again, this court disagrees.

Plaintiffs' efforts concerning non-rFSH proteins are not relevant to the issues of Organon's alleged past or prospective infringement of the rFSH patents in suit. While the claims globally encompass the subject matter of fertility hormones, they are distinct from the claims of the patents in suit. Plaintiffs represent that the Examiner in the U.S. Patent and Trademark Office ("the Examiner") raised an issue of double patenting against the '647 application, which issued as the '805 patent, based on the pending '228 application.[7] After the Examiner's initial objection, plaintiffs amended the '228 application to delete FSH from the claims of that application, leaving only claims implicating hLH and hCG. (Docket Entry # 126, Ex. K). Subject to plaintiffs producing this information in affidavit form, plaintiffs' efforts pertaining to non-FSH proteins are not relevant and need not be produced.

■ Moreover, disclosure of applications, including abandoned applications, *see* 37 C.F.R. § 1.14(b), "should be compelled only where they have a direct bearing on the issues being litigated." *Struthers Scientific & International Corporation v. General Foods Corporation,* 45 F.R.D. 375, 381–382 (S.D.Tx.1968). Plaintiffs agree to reexamine the applications noted on pages seven through nine of defendants' supporting memorandum (Docket Entry # 110) and, to the extent such application files concern human

---

5. The sole case cited by defendants to support their position that the documents sought are relevant to the instant proceedings is *Stanley Works v. Haeger Potteries, Inc.,* 35 F.R.D. 551, 556–557 (N.D.Ill.1964). (Docket Entry # 110, pp. 5–6). The case ends at page 556. Pages 555 and 556 concern objections to producing discovery of certain tests based on the attorney client or work product privilege as opposed to the time constraints at issue in the present dispute.

6. As summarized by one court:

The test for determining whether double patenting exists comprises a two part analysis, i.e., whether the patent in question is the "same" invention and, if not, whether the patent is an obvious variation of the other. *Phillips Petroleum Company v. U.S. Steel Corporation,* 673 F.Supp. at 1310. It is the claims rather than the specifications of the two patents which determine double patenting. *Ortho Pharmaceutical Corporation v. Smith,* 959 F.2d 936, 943 (Fed.Cir.1992).

7. Plaintiffs further represent that the Examiner originally based his double patenting objection on the '211 application, which was later abandoned in favor of the '959 application, which was also abandoned in favor of the '673 application. (Docket Entry # 126, n. 4).

FSH, plaintiffs agree to produce such information. Plaintiffs further agree to reexamine other foreign files to the same extent. (Docket Entry # 126, pp. 11–12). Plaintiffs are directed to conduct the above described reexamination.

Subject to plaintiffs conducting the above noted reexamination and producing the above noted affidavit forthwith, defendants' motion to compel (Docket Entry # 109) is **DENIED**.

## II. *DEFENDANTS' MOTION TO QUASH DISCOVERY PERTAINING TO RECOMBINANT MUTANTS OF HUMAN FOLLICLE STIMULATING HORMONE (DOCKET ENTRY # 106)*

■ Defendants move to quash discovery sought by plaintiffs involving Organon's research in the United States to produce variant forms of FSH. (Docket Entry # 106). In particular, without addressing specific requests for production of documents, defendants move to quash all of the documents requested by plaintiffs in their fifth set of requests for production of documents. The research at issue is being conducted by Dr. Irving Boime ("Dr. Boime") of the Washington University School of Medicine in St. Louis, Missouri. Dr. Boime conducts research in gonadotropin hormones such as CG, LH and FSH. (Docket Entry # 106, Ex. 5).

OIBV conducted the initial research in The Netherlands. (Docket Entry # 106, Ex. 4). Absent a further showing by plaintiffs of the relevance and need for information regarding defendants' foreign research activities, defendants need not produce information concerning their initial research in The Netherlands in an effort to obtain foreign patents relating to FSH variants.

■ The research being conducted by Dr. Boime in the United States and his correspondence with OIBV officials concerning the subject matter of his activities in the United States, however, is relevant to the issue of defendants' alleged infringement of the patents in suit. The experimental use exception does not protect experiments or tests which have a commercial purpose. *See Baxter Diagnostics, Inc. v. AVL Scientific Corporation*, 798 F.Supp. 612, 620 (C.D.Cal.1992) (discussing reach of experimental use rule). The parties dispute the nature and purpose of Dr. Boime's activities. While section 271(e) and case law may provide a safe harbor for certain forms of research, plaintiffs are entitled to discover the factual underpinnings of Dr. Boime's activities in order to assess whether all of Dr. Boime's activities in the United States are protected. Stated otherwise, plaintiffs may discover the nature and purpose of Dr. Boime's activities in the United States and his relationship vis-a-vis such activities with Organon and OIBV.

Defendants' motion to quash (Docket Entry # 106) is **DENIED** except to the extent plaintiffs seek information concerning defendants' initial research conducted abroad which does not involve the activities of Dr. Boime in the United States.

## III. *DEFENDANTS' MOTION FOR SUPPLEMENTAL PROTECTIVE ORDER (DOCKET ENTRY # 124)*

■ Defendants contend they need additional protection with respect to documents generated in the course of preparing a new drug application for filing with the Food and Drug Administration ("FDA"). The documents at issue are more fully described in this court's prior Order. (Docket Entry # 119). The Order allowed defendants the opportunity to seek supplemental protection in the event the existing protective order inadequately protected their interests.[8]

---

8. The Order states as follows:
Because the enforcement or the effectiveness of a protective order is somewhat problematic, *see In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1033 (8th Cir.1991) (after the fact enforcement of protective order often ineffectual in trade secrets case), however, defendants may apply to this court for supplemental protection. In particular, should defendants continue to believe that disclosure under the restricted confidential category will result in harmful disclosure of its confidential research data, they should apply to this court for a supplemental protective order and demonstrate, by affidavit or otherwise, the necessity for supplemental protection.
(Docket Entry # 119, p. 11).

Defendants seek to restrict the number and the location of copies of the FDA related documents. In particular, defendants wish to limit the review conducted by plaintiffs' expert, Dr. Martha Carter ("Dr. Carter"). Defendants also endeavor to require that all FDA related documents remain in the Boston offices of defendants' counsel, subject to certain limited exceptions. (Docket Entry # 124 & Proposed Supplemental Protective Order).

Defendants, as the parties seeking further protection, bear the burden of proof to establish the need for such protection.[9] (Docket Entry # 119). Where, as here, "a protective order is agreed to by the parties before its presentation to the court, there is a higher burden on the movant to justify modification of the order." *Allegheny Ludlum Corporation v. Nippon Steel Corporation,* 1990 WL 6152 at *1 (E.D.Pa. January 25, 1990) (motion to amend stipulated protective order to include certain individuals under category of "qualified persons" in patent action denied). Determining appropriate safeguards within a protective order is generally a matter within this court's discretion. *Centurion Industries, Inc. v. Warren Steurer,* 665 F.2d 323, 326 (10th Cir.1981).

Defendants fail in their burden of establishing how the existing protective order insufficiently protects their interests. The existing protective order categorizes the FDA related documents into either a restricted or restricted confidential category. Access to documents designated restricted confidential is limited to outside litigation counsel, support personnel of outside litigation counsel and no more than five independent experts. (Docket Entry # 96). Thus, plaintiffs' in house counsel and scientists lack access to documents designated restricted confidential.

As framed, the Proposed Supplemental Protective Order would essentially prevent plaintiffs' counsel, located in Chicago, from maintaining a complete set of the documents in his Chicago office. Although the Proposed Supplemental Protective Order permits "copies of selected individual documents that are

reasonably required for use in the Chicago offices of [plaintiffs' counsel]" to be "used in that office," such a solution is impractical and unduly hampers plaintiffs' counsel's access to the FDA related documents.

Defendants' motion for supplemental protection (Docket Entry # 124) is therefore **DENIED.**

## IV. *DEFENDANTS' MOTION TO DISMISS (DOCKET ENTRY # 7); DEFENDANTS' RENEWED MOTION TO DISMISS (DOCKET ENTRY # 36)*

On October 13, 1992, defendants filed a motion: (1) to dismiss Count I based on lack of personal jurisdiction; (2) to dismiss Count II based on lack of personal jurisdiction; (3) for a judgment of noninfringement under Count I based on (a) the doctrine of *de minimis non curat lex* and (b) section 271(e); and (4) a stay of discovery except for discovery related to the instant motion. (Docket Entry # 7). Plaintiffs subsequently filed a second amended complaint. (Docket Entry # 17). Consequently, on November 20, 1992, defendants filed a motion to: (1) renew their motion of October 13, 1992; (2) dismiss Count III based on lack of personal jurisdiction; (3) dismiss Count IV as to OIBV and Organon Teknika Corporation based on lack of personal jurisdiction; and (4) stay discovery except for discovery related to the instant motion. (Docket Entry # 36).

On February 2, 1993, the parties filed a stipulation dismissing Organon Teknika Corporation as a party, conditionally dismissing Count III and waiving the defense of lack of personal jurisdiction as to the remaining defendants, OIBV and Organon. (Docket Entry # 69). On June 18, 1993, this court heard argument on the October 13 and November 20, 1992 motions (Docket Entry ## 7 & 36) and directed plaintiffs to file a response on or before July 2, 1993. At the hearing, plaintiffs withdrew their claim for damages as to the activities of Microbiological Association, Inc. ("MAI"). (June 18, 1993 Hearing, Tr. 24).

---

**9.** The law concerning issuance of a protective order is more fully set forth in this court's prior

Order. (Docket Entry # 119).

On July 2, 1993, plaintiffs filed their opposition to the October 13 and November 20, 1992 motions. (Docket Entry # 91). Therein, plaintiffs note that all matters pending in the October 13 and November 20, 1992 motions are resolved with the exception of defendants' request for a judgment of noninfringement as to Count I under the doctrine of *de minimis non curat lex.*

On July 23, 1993, this court requested counsel to review the docket sheet and determine what motions, if any, are pending. By letter dated July 30, 1993, counsel state that the October 13 and November 20, 1992 motions are moot except with respect to defendants' motion for a judgment of noninfringement of the '805 patent as to Count I and that, with respect to MAI's acts, the motion is also moot. (Docket Entry # 101). The only acts identified by defendants in their supporting memorandum to support their argument for a judgment of noninfringement as to Count I under section 271(e) are the acts of MAI. (Docket Entry # 9, pp. 13–14). Accordingly, this court will address primarily the issue of whether a judgment of noninfringement of the '805 patent under Count I is appropriate under the doctrine of *de minimis non curat lex.*[10]

The conduct at issue revolves around three importations of small quantities of rFSH to Dr. Gary Hodgen ("Dr. Hodgen"), Dr. Boime and Dr. A.J.W. Hsueh ("Dr. Hsueh") in 1991 and 1992. Defendants argue that the importation of insignificant amounts of rFSH does not infringe the claims of the '805 patent. They point out that the relatively small shipments of rFSH have or are being returned to OIBV. They maintain that OIBV limits its current activities to assisting Organon in preparing Organon's IND of an rFSH product produced under a two vector process. (Docket Entry # 9).

Plaintiffs argue that defendants' past acts of importation substantially injure plaintiffs and were neither insignificant in amount or in effect. According to plaintiffs, defendants also fail to provide sufficient assurance that their past infringing acts will not continue or resume. (Docket Entry # 91).

While defendants fail to cite the applicable rule of civil procedure, they move for a judgment of noninfringement "as a matter of law." (Docket Entry # 9, p. 10). Accordingly, this court reviews the record under Rule 56, Fed.R.Civ.P. For purposes of summary judgment, this court finds the following facts.

As noted above, the instant dispute centers around three acts of importing rFSH into the United States. The first transaction took place in December 1991 when OIBV sent 100 ampules of rFSH and other materials to Dr. Hodgen, a Professor at the Department of Obstetrics and Gynecology at the Jones Institute for Reproductive Medicine in Norfolk, Virginia. Dr. Hodgen signed an agreement limiting his use of the materials to laboratory animals or *in vitro* tests. (Docket Entry # 13, Ex. C). The purpose of his studies was, in part, to determine whether FSH alone or in combination with LH could be used to stimulate ovarian follicles.[11] As a result of Dr. Hodgen's laboratory studies using rFSH and another material in monkeys, OIBV determined that rFSH could stimulate follicle activity in monkeys without the addition of LH. (Docket Entry # 13, Ex. C & G).

The second transaction occurred in July 1992 when OIBV sent Dr. Boime, a member

---

**10.** As discussed *infra,* however, section 271(e) relates to defendants' contention that their activities are *de minimis.*

At the June 18, 1993 hearing, defendants' counsel stated that the motion to dismiss "has nothing to do with regulatory affairs." (Tr. 17). In the event defendants do not agree with this construction, they may renew their motion.

With the exception of the above noted issue, this court **RECOMMENDS** that the October 13 and November 20, 1992 motions (Docket Entry ## 7 & 36) are **MOOT.** See footnote number 18.

**11.** FSH or follicle stimulating hormone is a pituitary hormone which stimulates the development of the follicle and the release of one or more eggs during a menstrual cycle. LH or luteinizing hormone is another pituitary hormone which stimulates the corpus luteum in the ovary to produce progesterone. Infertility difficulties sometime result when the production of FSH and/or LH is insufficient. With the advent of genetic engineering, members of the scientific community began to question whether recombinant forms of FSH alone or in combination with LH could treat infertility. (Docket Entry # 13).

of the Department of Molecular Biology and Pharmacology at the School of Medicine of Washington University, 100 ampules of rFSH. As understood between OIBV and Drs. Boime and Hsueh, Dr. Boime forwarded 50 ampules of the rFSH to Dr. Hsueh, a member of the Department of Obstetrics and Gynecology at Stanford University in Stanford, California. (Docket Entry # 12). The purpose of Drs. Boime's and Hsueh's research was to standardize their tests with OIBV tests conducted in The Netherlands. According to a July 17, 1992 letter from OIBV to Dr. Boime, Drs. Boime's and Hsueh's use of the rFSH was "meant for reference purposes only in analytical tests to be performed in the Field." (Docket Entry # 12, Ex. C). OIBV also advised Dr. Boime that any data or "know-how collected with [the rFSH] samples ... should warrant the confidentiality and *commercial rights* [emphasis added] of Organon with respect to these samples." (Docket Entry # 12, Ex. C). Similarly, Dr. Boime confirms that under the license and research agreements he entered into "with Organon" in January 1992, "Organon received an exclusive license under any proprietary rights that [Dr. Boime] might generate in the course of performing research." (Docket Entry # 97, Boime Declaration).

The third transaction took place in August 1992 when OIBV sent Dr. Boime 100 vials of rFSH each containing 2.4 international units of rFSH in conjunction with performing an FSH enzyme immunoassay. The purpose of the shipment to Dr. Hsueh was to calibrate and standardize his measurements of FSH

immunoactivity with those of OIBV in The Netherlands. (Docket Entry # 12).

Upon learning of the instant litigation in August 1992, OIBV requested that Drs. Boime and Hseuh return the July and August 1992 shipments of rFSH to OIBV. Drs. Boime and Hsueh respectively returned 50 and 48 ampules of the July 1992 shipment of rFSH.[12] OIBV further advised Dr. Hsueh to return the remaining samples of the August 1992 shipment of rFSH. (Docket Entry # 12).

OIBV manufactured the rFSH with host cells containing one vector encoded for alpha and beta subunits. Organon's President avers that in the future it will import, use and/or sell only rFSH produced through a two vector process. Organon intends to seek FDA approval to use and market an rFSH product in the United States produced through the two vector process. (Docket Entry # 10).

The purpose of Dr. Boime's research contract with OIBV is to develop analog mutant molecules with gonadotropic activity. Dr. Boime is active in developing a mutant analog of rFSH or a product with rFSH activity "for Organon." Dr. Boime signed the research contract in or around January 1992.[13] "Organon" sponsors Dr. Boime's research and if his research results in new products with FSH activity, "Organon" would have proprietary rights to the product or construct.[14] Dr. Boime forwards materials to "Organon," including mutant analog versions of a gonadotropin hormone with FSH activity. (Docket Entry # 91, Ex. C).

12. Two ampules of the July 1992 shipment from Dr. Boime to Dr. Hseuh were damaged during shipping.

13. The research contract is presumably one of the license and research agreements which Dr. Boime entered into in January 1992. (Docket Entry # 97, Boime Declaration). As noted *supra,* under the January 1992 agreements, "Organon" received an exclusive license for any proprietary rights generated by Dr. Boime during his research. (Docket Entry # 97, Boime Declaration). As further noted by Dr. Frank van Meel at his deposition, Dr. Boime has filed a patent application in the United States and in Europe. "Organon" has exclusive "license rights" under

one or more of Dr. Boime's patent applications. (Docket Entry # 91, Ex. C).

14. Both Dr. Boime in his declaration and Dr. Frank van Meel in his deposition refer to Dr. Boime's contractual relationship with "Organon," without distinguishing whether "Organon" refers to OIBV or Organon, Inc. Inasmuch as Dr. Boime's correspondence and communications in the record are with OIBV rather than Organon (Docket Entry # 12, Ex. C–E), this court concludes that Dr. Boime's contractual relationship is with OIBV. It is unnecessary to the resolution of the instant motion to decide whether Dr. Boime also has a contractual relationship with Organon.

In February 1992, Dr. Boime coauthored an article describing his work developing FSH variants. (Docket Entry # 91, Ex. D & E). Therein he describes a procedure which uses a vector containing a sequence of DNA encoding the beta subunit of human FSH. A fragment of the beta subunit of the human FSH gene is then ligated with a fragment of the beta subunit of human chorionic gonadotropin. (Docket Entry # 91, Ex. D & E).

Claim 2 of the '805 patent is "a vector comprising a DNA sequence encoding the beta subunit of human FSH." (Docket Entry # 91, Ex. A).

The February 1992 article also describes using human FSH derived "by culturing mammalian cells capable of glycosylating proteins" containing an expression vector encoding the alpha and beta subunits of human FSH, according to Dr. Scott Chappel, a former employee of "Ares–Seronno" and Assistant Professor at the University of Pennsylvania Medical School. (Docket Entry # 91, Ex. E). Claim 1 of the '805 patent is "a method for producing biologically active, heterodimeric human FSH comprising culturing mammalian cells capable of glycosylating proteins." The cells in Claim 1 comprise "an expression vector encoding alpha and beta subunits of said FSH." (Docket Entry # 91, Ex. A).

## DISCUSSION

■ "Summary judgment is as appropriate in a patent case as in any other case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Amgen, Inc. v. Chugai Pharmaceutical Company, Ltd.,* 706 F.Supp. 94, 98 (D.Mass.1989). Defendants move for summary judgment with respect to Count I on the grounds that their acts of importing rFSH do not give rise to acts of infringement of the '805 patent as a matter of law under the doctrine of *de minimis non curat lex.* (Docket Entry ## 7 & 36).

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Inferences are drawn in favor of plaintiffs, the nonmoving parties. *Space*

*Master International, Inc. v. City of Worcester,* 940 F.2d 16 (1st Cir.1991); *Herbert W. Price v. General Motors Corporation,* 931 F.2d 162 (1st Cir.1991).

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41 (1st Cir. 1992) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies,* 882 F.2d 993 (5th Cir.1989) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

As the moving party, defendants must affirmatively show there is an absence of evidence to support the nonmoving parties' case. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once defendants carry their burden under Rule 56(c), plaintiffs, as the nonmoving parties, must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Under Rule 56(e), Fed.R.Civ.P., plaintiffs must go beyond the pleadings and show " 'specific facts showing that there is a genuine issue of fact for trial.' " *Amgen, Inc. v. Chugai Pharmaceutical Company, Ltd.,* 706 F.Supp. at 98 (citation omitted); *see also Lawrence v. Northrop Corporation,* 980 F.2d 66, 68 (1st Cir.1992).

Under Count I, plaintiffs contend that defendants produced rFSH outside the United States by using mammalian host cells containing expression vectors with recombinant DNA encoding the alpha and beta subunits of FSH. (Docket Entry # 17, ¶ 33). Plaintiffs allege that such importation constitutes infringement under 35 U.S.C. § 271(g).

Unlike section 271(a), which requires an act of making, using or selling prohibited goods, section 271(g) prohibits the importation of goods manufactured abroad through a process patented in the United States. *Bris-*

*tol–Myers Company v. Erbamont, Inc.*, 723 F.Supp. 1038, 1042 (D.Del.1989). Sections 271(a) and 271(g) thus "provide two distinct thresholds for infringing activity for two different reasons ... Each statute, therefore, must have its own distinct threshold level of activity." *Id.* at 1044.

Defendants rely, in part, on *Amgen, Inc. v. Chugai Pharmaceutical Company, Ltd.*, 1989 WL 169006 (D.Mass. Dec. 11, 1989), *aff'd in part and vacated in part*, 927 F.2d 1200 (Fed.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). With respect to the portion of the decision relied upon by defendants, *Amgen* involves strikingly similar acts of allegedly infringing activity, i.e., a single transfer of a small quantity of host cells. The court denied the claim, after trial, for three reasons. The third reason was that a single transfer of host cells was a *de minimis* occurrence and therefore not an infringement. *Amgen, Inc. v. Chugai Pharmaceutical Company, Ltd.*, 1989 WL 169006 at *62.

While plaintiffs fail to cite *Amgen,* the opinion is distinguishable because it involves a determination based on the testimony and evidence at trial as opposed to whether the evidence in the record establishes *de minimis* activity as a matter of law. In addition, the single transfer occurred prior to the effective date of section 271(g). It is therefore evident that the *Amgen* finding of *de minimis* activity rests on section 271(a). While section 271(a) focuses on the sale or use of a patented product, section 271(g) focuses on the importation of a product made by a process patented in the United States. The threshold levels of infringing activities under each section are distinct. Consequently, a finding of *de minimis* activity under section 271(a) does not necessarily compel a finding of *de minimis* activity under section 271(g). Finally, defendants' acts concern three importations of rFSH rather than a single transfer of host cells. Thus, while *Amgen* is instructive, it is not determinative with respect to defendants' motion for summary judgment based on their allegedly *de minimis* activity.

Turning to section 271(g), the statute provides, in pertinent part, that:

> (g) Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale or use of the product occurs during the term of such process product patent.

35 U.S.C. § 271(g). Thus, liability is imposed for products "made by" a patented process.

In the event the statutory language of a statute is unclear, this court may turn to legislative history. Because this court finds the meaning of the term "made by" unclear,[15] this court turns to the legislative history. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). As noted in the Senate and House Reports, "minor chemical changes," such as converting a salt or ester, are not material changes. In order to provide meaningful protection to the patented process, a foreign manufacturer cannot avoid liability through trivial or conventional changes. *See* Glenn Law, Note, *Liability Under the Process Patent Amendments Act of 1988 for the Use of a Patented Process Outside the United States,* 60 George Washington Law Review 245, 262–264 (1991) (discussing the language "made by" in context of legislative history of section 271(g)). The burden of establishing that a foreign product was not made by a patented process rests "on the party asserting it was not so made." 4 Donald S. Chisum *Patents* § 16.02[6] (1993).

Recombinant FSH produced by the two vector process is not encompassed within the processes claimed in the '805 patent. Rather, the '805 patent encompasses certain methods to produce rFSH through the one vector process.

Defendants move for judgment as a matter of law under Count I. (Docket Entry ## 7,

---

15. For example, does the term require the foreign product to use an absolutely identical process embodied in the claims of the patented process and, if not, to what degree can the foreign product vary from the patented process?

9 & 36). In particular, they argue that their activities do not give rise to infringing acts under section 271(g) under the doctrine of *de minimis non curat lex.* (Docket Entry # 9). The *de minimis* exception "is a very narrow one that does not apply to acts of infringement committed by a business in furtherance of some commercial purpose." *Baxter Diagnostics, Inc. v. AVL Scientific Corporation,* 798 F.Supp. 612, 620 (C.D.Cal.1992) (material issue of fact precluded summary judgment as to whether infringing use was *de minimis* ). The doctrine "is based on a showing that the infringing activity is insignificant and that it was terminated at the *de minimis* stage." *Collins & Aikman Corporation v. Stratton Industries, Inc.,* 728 F.Supp. 1570, 1578 (N.D.Ga.1989). Not only must the amount imported be insignificant, but the alleged importation of a product made by a process patented in the United States must have been terminated. *Cf. Imperial Chemical Industries, PLC v. Henkel Corporation,* 545 F.Supp. 635, 656–657 (D.Del.1982).

Dr. Boime's activities, as evidenced by his February 1992 article published at a time when he was under contractual commitments to OIBV, may encompass the two claims in the '805 patent. While this court realizes that Dr. Boime's activities in authoring this article most likely took place prior to January 1992, the record lacks sufficient assurances that Dr. Boime's future activities will not continue to implicate the processes involved in the '805 patent. In particular, while Dr. Boime's personal research activities might not infringe the '805 patent, OIBV's contractual relationship to any proprietary rights from Dr. Boime's research troubles this court. Stated otherwise, OIBV's ongoing relationship with Dr. Boime presents the possibility of future importations and future acts of infringement on the part of OIBV.

The strongest evidence to support defendants' *de minimis* argument is paragraphs five and six of the Declaration of Brian Haigh, President of Organon. (Docket Entry # 10, ¶¶ 5 & 6). After admitting that in the past OIBV had supplied Drs. Boime,

Hodgen and Hsueh with rFSH material made through the process of host cells containing a single vector encoded with alpha and beta subunits of human rFSH, Brian Haigh ("Haigh") avers that:

> In the future, OI will import, use, have used, or sell only the non-infringing version of recombinant FSH produced by the two vector process ... To my information and belief, the transactions with recombinant FSH described in the declarations of Drs. Bennik, de Leeuw and van Meel are the only recombinant FSH that has ever been supplied by OIBV to parties in the United States. Future imports of the American version [16] of recombinant rFSH will be strictly and solely for the use in clinical testing to support the IND and the NDA applications that will be filed with USFDA.

(Docket Entry # 10). Although Haigh unequivocally avers that future importations of the "American version" of rFSH will be strictly limited to clinical testing, this court cannot resolve this issue with the present record.

The issue of whether OIBV's activities in the future will fall wholly within the confines of section 271(e) undoubtedly weighs in defendants' favor in light of Haigh's declaration. The province of this court on a summary judgment motion is not to weigh conflicting evidence. It is to determine the existence or nonexistence of genuine issues of material fact.

OIBV admits to its past importation of rFSH. In light of the factual circumstances and the parties' competitive business relationship, such importation is not insignificant as a matter of law. In addition, as indicated in Dr. Boime's February 1992 article, it is likely that Dr. Boime's research prior to February 1992 encompassed the use of processes claimed in the '805 patent. The possibility exists that OIBV will import rFSH produced through the single vector process in the future to support the development and approval of an rFSH product produced through the two vector process. Whether OIBV's activities will fall completely within

---

**16.** It is not entirely clear from the record that Haigh's reference to the "American version" refers to rFSH produced through the one vector method.

the parameters of section 271(e) or the experimental use exception [17] is problematic.

Dr. Boime fails to submit a detailed affidavit that his present and future use of any rFSH produced through the one vector process is solely for uses reasonably related to developing an rFSH product for regulatory approval. Because of the contractual relationship between OIBV and Dr. Boime as well as the content of Dr. Boime's February 1992 article, there exists a genuine issue of material fact that OIBV's infringing activities have not terminated.

In sum, this court cannot find the absence of a genuine issue of material fact that the past importations of rFSH produced through the one vector process were insignificant. Nor can this court find the absence of a genuine issue of material fact that OIBV's activities have terminated.

## CONCLUSION

In accordance with the foregoing discussion, defendants' motion to compel (Docket Entry # 109) is **DENIED** subject to plaintiffs conducting the above noted reexamination and producing the above noted affidavit. Defendants' motion to quash (Docket Entry # 106) is **DENIED** except to the extent plaintiffs seek information concerning defendants' internal research conducted abroad which does not involve the activities of Dr. Boime in the United States. Defendants' motion for supplemental protection (Docket Entry # 124) is **DENIED.**

This court **RECOMMENDS**[18] that defendants' October 13 and November 20, 1992 motions (Docket Entry ## 7 & 36) be **DENIED** as to defendants' argument that their activities are *de minimis* under Count I. This court further **RECOMMENDS**[19] that the remaining issues in the motions (Docket Entry ## 7 & 36) are **MOOT.**[20]

17. OIBV's contractual relationship with Dr. Boime would not exist but for the prospect of producing a commercial product. If "experiments are conducted with a view to the adaption of the invention to the experimenter's business, the acts of making or of use are violations of the rights of the inventor and infringements of his patent." *Id.* at 620 (quoting *Pfizer, Inc. v. International Rectifier Corporation,* 1982 WL 51039 (C.D.Cal.1982), emphasis omitted); *see Radio Corporation of America v. Andrea,* 90 F.2d 612, 614 (2d Cir.1937) (tests to determine marketability were commercial in nature and did not constitute experimental use); *see also Pitcairn v. United States,* 547 F.2d 1106, 1125–1126 (Ct.Cl.1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978) (declining to apply experimental use as a defense to certain tests and experiments).

18. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

19. See the preceding footnote.

20. See footnote number ten.